CASEY ET AL., APPELLANTS, *v.* THIEVIEGE ET AL., RESPONDENTS.

[Submitted March 23, 1897. Decided April 5, 1897.]

*Placer Mines—Known Veins—Burden of Proof—Evidence.*

The expression "known veins or lodes" used in section 2333, United States Revised Statutes, includes such veins only as are clearly ascertained and of such a character as to render the land more valuable on that account and to justify exploitation.

SAME—*Burden of Proof.*—One who claims a quartz lode mining claim which is included in the boundaries of a patented placer claim, has the burden of proving that the vein was a "known vein" when application was made for the placer patent.

SAME—*Evidence.*—The facts given in evidence must prevail over the conclusion which the witnesses incorrectly draw from the facts; the conclusion is more of a question of law.

SAME.—Accordingly, where the facts in evidence are merely that the witnesses had found, prior to the application for the placer patent, streaks of quartz, croppings that indicated the existence of leads and, under these croppings, veins between granite walls and, in their opinion, carrying silver, the location of a mining claim on one of

these veins and partly within the placer claim, and the abandonment of the same because of the expense of working it –and where no assay or other means had been tried to determine whether or not the vein carried any ore of marketable value — *Held*, that the evidence did not justify the finding of the jury that the "veins" were "known veins or lodes" within the meaning of section 2333.

*Appeal from District Court, Silver Bow County. J. J. McHatton, Judge.*

ACTION by George H. Casey and others against Theophile Thieviege and others. Judgment for defendants, and plaintiffs appeal. Reversed.

Statement of the case by the justice delivering the opinion.

Appellants (plaintiffs below) brought an action in ejectment against 73 defendants to recover possession of certain land lying within the limits of Butte City, Montana. A judgment was recovered against all of said defendants except the respondents in this appeal. The facts are substantially as follows: The grantor of plaintiffs, one Black, filed an application in the proper United States land office for a patent to a certain placer claim, about four acres in area, on June 20, 1879. The patent was issued for said tract, known as the "Black Placer," on November 9, 1891. During some 12 years prior to said application the said land had been worked as a placer mine by different parties. Certain of these parties testified in behalf of respondents that in digging and sluicing the Black placer for gold, as was usual in respect to other placer grounds in the vicinity, they had frequently encountered strata and streaks of quartz, had observed croppings on its surface indicating the existence of quartz leads, and that under these croppings, between walls of granite on bedrock, veins of quartz had been exposed, bearing, in their opinion, silver and other precious metals; that three such veins, as the surface was stripped off here and there in the course of their placer mining, could be plainly traced across said tract, and were readily observable by means of the croppings aforesaid, and at the points of the bedrock exposure aforesaid, both prior to and after the date of the application of Black for his patent.

One of the witnesses testified that he had sunk on some of these leads on the Black placer that "played out," and that he did not know at the time that there were quartz leads of any value on the ground.    Another witness testified that when one of these three traceable leads had been exposed on bedrock, it was three or four feet wide, and his partner thought it "a favorable prospect, and wanted to locate it, and asked his advice."    He told him "that they had a hundred locations too many" already.    The ground prior to 1878 was generally regarded as valuable for placer mining only, according to the placer miner who testified as to value.    No assays were made during the placer mining days.    On April 20, 1878, one Hirbour and one Hume located a quartz lead, and called it the "Leo."    This claim included a large portion of the Black placer.    The discovery shaft of the Leo was 40 to 50 feet west of the Black placer line, and the lead on which the discovery was claimed to have been made was, in the opinion of certain witnesses, one of the three traceable veins testified to as extending through said Black placer.    The first year Hirbour and Hume, according to the former's testimony, sunk their discovery shaft to a depth of 18 or 20 feet.    The second year Hume did the representation work on the Leo in the fall of 1879.    Hirbour also testified that in 1878 or 1879 he himself or Hume sunk a shaft on the Leo within the Black placer limits, which was about 6 feet by 4 feet, and 10 feet deep, and that there was exposed therein a vein of silver bearing quartz from which he (Hirbour) took a few pounds of ore.    Subsequently, however, Hirbour modified this testimony by stating that he could not swear that the last-mentioned shaft was within the boundaries of the Black placer.    The Leo was represented for two years only; $200 of work alone being expended in its representation.    Then Hirbour and Hume abandoned the claim, because of difficulty and expense in working it.    In the fall of 1879, one Largey relocated the Leo claim as the "Montana Central" quartz claim.    Largey testified that in a shaft of the Leo, which was about eight or nine feet deep, he found what he designates as a "blind lead," and

that this was the discovery on which he based his location. He testified that the lead he discovered was below, and detached from, the croppings which induced him to prospect the said vein. These croppings ran into the Black placer ground. Largey also stated that he had done considerable work on the Montana Central, having represented it for a number of years, and in the course of it had sunk shafts within the Black placer; and that in sinking these shafts he had found quartz, but no lead with well defined walls. He also testified that the surface of the Black placer was covered with debris from the old placer diggings, and that the bedrock was visible in very few places. Largey had instituted a contest in the United States land office with the owners of the Black placer, which resulted in a compromise, whereby the owners of the Black placer were to give him (Largey) a portion of their ground, and in exchange therefor he was to give them a portion of the Montana Central ground. On January 4, 1887, the Blue Dick quartz lode, was located by certain of the respondents. It embraced a large portion of the Black placer ground. The vein of the Blue Dick was one of the three traceable leads testified to as crossing the Black placer. The discovery shaft on the Blue Dick, according to the testimony of the locators, was about 40 or 60 feet deep. In this shaft was found a vein of quartz containing silver, and also native copper. Two assays were made of specimens of ore taken from this discovery shaft at about the time of its discovery, January 4, 1887, one of which ran 29 ounces in silver to the ton, and the other 11 ounces to the ton. It does not appear that it had been worked with the end in view of extracting ore from it. At the time of the institution of this suit the Black placer presented a different appearance from the one it wore in the days of placer mining. Sawdust from a wood yard had been thrown about; some dwelling houses and cabins had been built upon it; and, although the croppings still remained in places, much of the exposed bedrock had been covered again. The Black placer adjoined the original townsite of Butte City. In their complaint, plaintiffs asked as damages the rental values of the

premises. The following special questions, by request of defendants, were submitted to the jury, each of which was answered in the affirmative: First. ''Was there, at any time before the 20th of June, 1879, a vein, lead, or lode of quartz or other rock in place bearing any gold, silver, lead, tin or copper whatsoever, known to any person or persons to exist, within the boundaries of the placer claim and ground in controversy in this action?'' Second. ''If such vein, lead or lode did exist, could its existence have been ascertained before the 20th day of June, 1879, by Leander M. Black, the applicant for the patent introduced in evidence in this action, or by any other person or persons examining the said ground in dispute with an honest endeavor to learn or ascertain if it contained any such veins or lodes?'' The jury also found a general verdict against plaintiffs, and answered two other questions submitted adversely to them. Plaintiffs appeal from the order of the district court denying a motion for a new trial, and from the judgment rendered on the verdict and special findings.

*F. T. McBride*, for Appellants.

*Thompson Campbell, J. T. Baldwin* and *W. I. Lippincott*, for Respondents.

BUCK, J.—This case is the result of a conflict between a placer patent and a quartz lode location made subsequent to the application for the placer patent. In investigating the questions involved, we accord full force and effect to the general rule that, where there is a conflict in evidence on a trial, the verdict should not be disturbed on appeal. The verdict in this case, then, must be sustained, if there is competent evidence to support it. We must accept as proven the fact that, at the time the application was made for a patent to the Black placer claim, its surface indicated veins of mineral bearing rock in place. It is true that witnesses on behalf of respondents testified positively that such veins or lodes were in the claim, and plainly visible as veins or lodes at the time of such

application.    But, inasmuch as these witnesses gave in detail
the facts on which they based this assertion, these facts, and
not the mere assertion based thereon, however positively
made, should be considered.    The assertion was in the nature
of a legal conclusion, being only the expression of an opinion.
Hence in what we deem proven by respondents we do not go
to any greater extent than to concede that they showed in evi-
dence that the surface appearance of the Black placer, at the
date of the application for patent, indicated by croppings and
in exposed bedrock the existence of lodes or veins of mineral
bearing rock in place.

From the questions submitted to the jury and the argument
of their counsel in this court, it would seem that respondents
contend for this proposition of law, namely: that when an ap-
plication for a placer patent is made, any lode or vein of
quartz or other rock in place containing any gold, silver, lead,
tin or copper whatsoever, known to exist within the bound-
aries of the claim (or the knowledge of whose existence could
be ascertained by one examining the ground in an honest en-
deavor to acquire such knowledge), is excepted by section
2333, Revised Statutes of the United States, from a patent
issued on such application.    If this is the law, the determina-
tion of this appeal might be attended with more difficulty than
it is; for it also appears from the evidence herein—admitted
without objection—that some years after the application for a
patent for the Black placer claim, in the discovery shaft of
the Blue Dick quartz lode claim, sunk on one of the three so-
called "traceable veins" crossing the Black placer at the time
of application for its patent, a vein of ore was found carrying
as much as 29 ounces of silver to the ton, as shown by one of
the two assays made.    But we cannot agree with the proposi-
tion that this is the law.    It virtually eliminates from the
question of what is the vein or lode known to exist, the ele-
ments of value, character and extent of the existing vein or
lode.    In *Migeon* v. *Railway Co.*, 23 C. C. A. 163, 77 Fed.
256, Judge Hawley, speaking for the United States circuit
court of appeals, says:    "This section (2333) of the statute

was primarily intended for the benefit and protection of the locators of placer claims. If a lode is known to exist within the boundaries of a placer claim, the applicant for a patent must state that fact, and then, by paying $5 an acre for that portion of the ground and $2.50 for the balance, a patent will issue to him, covering both the lode and placer ground; but, if the lode is known to exist, and is not included in the application for a patent, then it will be construed as a conclusive declaration that the owner of the placer claim has no right of possession by virtue of his patent for the placer ground to the vein or lode. It matters not whether there is a lode or vein actually within the limits, which subsequent developments may prove; if it is not known to exist at the time of the application, the patent for the placer claim will include such lode or vein. In such cases the supreme court has repeatedly declared that it is not enough that there may have been some indications, by outcropping on the surface, of the existence of lodes or veins of rock in place bearing gold or silver or other precious metals, to justify their designation as 'known veins or lodes;' that in order to meet that designation, the lodes or veins must be clearly ascertained, and be of such extent as to render the land more valuable on that account, and justify their exploitation. (*Iron Silver Mining Co.* v. *Reynolds*, 124 U. S. 374, 383, 8 Sup. Ct. 598, 603; *U. S.* v. *Iron Silver Mining Co.*, 128 U. S. 674, 683, 9 Sup. Ct. 195, 199; *Iron Silver Mining Co.* v. *Mike & Starr Gold & Silver Mining Co.*, 143 U. S. 394, 404, 424, 12 Sup. Ct. 543, 545, 553; *Sullivan* v. *Mining Co.*, 143 U. S. 431, 12 Sup. Ct. 555; *Brownfield* v. *Bier*, 15 Mont. 403, 39 Pac. 461, and other authorities there cited.

"This construction as to the meaning of section 2333 is, in our opinion, founded in reason, and is in harmony with the construction given by the courts to the other sections of the statute relative to the rights of locators of mining claims upon the public lands of the United States. But, in any event, the rule, as above stated, is now too well settled to be departed from." In the case of *Iron Silver Mining Co.* v. *Mike &*

*Starr Gold & Silver Mining Co.*, 143 U. S. 394, 12 Sup. Ct. 543, cited *supra*, the court says:   "It is undoubtedly true that not every crevice in the rocks, nor every outcropping on the surface, which suggests the possibility of mineral, or which may, on subsequent exploration, be found to develop ore of great value, can be adjudged a known vein or lode within the meaning of the statute." And further the court says :   "The amount of the ore, the facility of working and reaching it, as well as the product per ton, are all to be considered in determining whether the vein is one which justified exploitation and working." In *Brownfield* v. *Bier*, 15 Mont. 403, 39 Pac. 461, the *Iron Silver Mining Co.* v. *Mike & Starr Gold & Silver Mining Co.* case, *supra*, is elaborately discussed.   Our supreme court there says :   "But in that case the contention within the court seems to us to have been more upon the question of facts in that particular case than upon a view of the law;" and proceeds to quote, as declaratory of the law, language taken from the majority opinion of the court, and also from the dissenting opinion rendered therein by Mr. Justice Field and Associate Justices Harlan and Brown.   Certain portions of this language are requoted below.

But the respondents urge, to meet this view entertained by the Montana supreme court of what was held in the Mike & Starr Gold & Silver Mining Co. case, that the question of value is one solely for the jury, and the facts in this case are stronger in favor of the verdict than those successfully invoked for the same purpose in the Mike & Starr Gold & Silver Mining Co. case.   This language is relied upon from the last-named decision to uphold the first contention :   "It is, after all, a question of fact for the jury.   It cannot be said, as a matter of law, in advance, how much of gold or silver must be found in a vein before it will justify exploitation, and be properly called a 'known' vein."

As to what were the particular facts involved in the Mike & Starr Gold & Silver Mining Co. case, the justices of the supreme court of the United States were divided in opinion, and this fact led the supreme court of Montana to use the language

it did in *Brownfield* v. *Bier, supra.* The majority of the justices claimed the record showed that, prior to the application for a patent to the placer claim of the Iron Silver Company, within the limits of said placer a tunnel had been run to the extent of 400 feet; that in said tunnel, about 75 or 80 feet from its mouth, a 15-inch vein of quartz, with distinct walls of porphyry, had been disclosed; and that assays of the ore taken from this vein had been made (apparently at the time it was found), showing that the same was valuable gold producing ore. Speaking of the facts involved, Mr. Justice Brewer, in delivering the opinion for the majority of the court, said : ''The placer tract was a small one of fifty-six acres. The tunnel ran 400 feet underneath its surface. At its mouth there was a large dump of earth taken from it. No one had a right to enter that ground as placer-mining ground, unless he had made such an inspection as to enable him to make affidavit that it was adapted to such mining. No examination could have been made without disclosing the existence of this tunnel. That was a fact upon the surface, obvious to the most casual inspection. No one could be heard to say that he had examined that ground in order to ascertain that it was suitable for placer mining, and in such examination had not discovered the existence of this tunnel. It was not a little excavation, with a few shovelfuls of dirt at its entrance. The pile of dirt was evidence which no one could ignore that it was a long tunnel, running far into the earth. It was in mining ground, as all this territory was believed to be, and, therefore, an excavation likely to disclose veins.

''As an applicant for a placer patent was chargeable with notice of the existence of the tunnel, so also was he chargeable with notice of whatever a casual inspection of that tunnel would disclose. He would not be heard to say: 'I did not enter and examine this tunnel, and therefore knew nothing of the veins apparent in it.' The government does not permit a person to thus shut his eyes and buy. If there be a vein or lode within the ground, it is entitled to double price per acre for it and the adjacent fifty feet; and, with such interest in the price

to be paid, it rightfully holds an applicant for a placer patent chargeable with all that would be disclosed by a casual inspection of the surface of the ground, or of such a tunnel.   The applicant must be adjudged to have known that which others knew, and which he would have ascertained if he had discharged fairly his duty to the government.'' But Mr. Justice Field, in the dissenting opinion, says:   ''It (the tunnel) extended 400 feet, but it disclosed within it only veins of decomposed porphyry and manganese iron.   *   *   *   There was no vein or lode of gold or silver bearing rock found in the tunnel, and there is an erroneous impression conveyed by the court (in the majority opinion) in that respect.''   Proceeding, Justice Field says:   ''But, as I shall show hereafter, the mere indication or presence of gold or silver is not sufficient to establish the existence of a lode.   The mineral must exist in such quantities as to justify expenditure of money for the development of the mine and the extraction of the mineral.   It would create surprise among miners to be told that if a trace of loose gold, such as is shown here, was found at any one spot in a tunnel leading to a placer claim, it would establish the existence of a vein or lode in the placer claim, and form the basis of a proceeding to despoil a purchaser from the patentee, years after the purchase, of a large portion of its mining property.   *   *   *   An unlocated lode claim, existing only in the impressions and beliefs of neighbors or others, and not in the knowledge founded upon discovery and exploration, does not seem to me to have any element of property or validity, or a basis of defense to proceedings to obtain a patent from the government.''   As we have said, there were indications of veins in the Black placer at the time of the application for its patent.   It is true that what appeared to be veins had been exposed between walls of granite in the bedrock. But not a particle of competent or sufficient evidence was offered by respondents (on whom rested the burden of proof) to establish the fact that these veins had been clearly ascertained, or contained minerals sufficient as to value, quantity, or character to justify exploitation.   Even by respondents'

own witnesses these quartz-filled crevices in the granite bedrock of the Black placer (that witnesses designated them positively as veins or lodes, as we have shown, was not sufficient evidence of the fact that they were) had never been explored, or even examined, with a view to prospecting or working them during the placer mining period. They were encountered just as strata seams and quartz filled crevices were usually encountered at the surface and on bedrock in working other placer mines in that vicinity. No serious attempt had been made to prospect or exploit them. A witness who sunk on some of them says ''they played out.'' Another witness dissuaded his partner from locating one of them, which he designates as the ''main vein,'' by suggesting that they had already a hundred locations too many. His partner, this witness says, regarded this vein at the time as a ''favorable prospect.'' Hirbour, the locator of the Leo quartz lode, may possibly have sunk a shaft for a few feet on one of these so-called ''traceable veins,'' but he found practically nothing. He says he took out a few pounds of ore. Largey struck what he calls a ''blind lead'' in his quartz lode claim, the Montana Central, which was located after the application for the placer patent. He says that at the point where he made his discovery of a blind lead the croppings (which extended from said point into the Black placer ground) were detached from the vein he found, and were only float. He states also that he sunk shafts within the Black placer on these so-called veins or leads, but did not even find as a result any vein with well defined walls. Largey may have been an interested witness, but the respondents put him upon the stand as their own witness, and we cannot find any testimony in the record which substantially contradicts his statements. The fact, of itself, that Largey and the owners of the Black placer were to exchange interests in their grounds by way of compromise, is not competent evidence to establish the value of the Montana Central quartz lode vein for exploitation at the date of the application for the placer patent. At the time of the application for patent, so far as the testimony for respondents shows, the extent and

definite character of the quartz in these crevices in the Black placer were unknown. No assays 'had been made of the quartz found on bedrock or elsewhere. The ground itself had been worked as a placer mine for years, and, according to all the witnesses who testified on the subject of the value of the quartz therein, was considered valuable for placer mining only. That quartz ore of value was found in the Blue Dick discovery shaft cannot avail respondents. The location of the Blue Dick was made some eight years after the application for the Black placer patent. However, no great amount of work (so far as the record discloses) had ever been performed in exploiting the Blue Dick vein. There was little evidence to show the value or extent of this vein. At the time of the trial of this suit in the lower court its discovery shaft was half full of water. Two of its locators had dwellings and outhouses on the ground before they made the location, and they were conducting a wood business on the premises at the time of the location. One of them had entered into possession of the premises in dispute under a deed from one Upton, who apparently had some kind of a possessory right to the ground. In 1888 one of the respondent defendants received two deeds from these locators, one of which conveyed to him a certain part of the property in dispute (described with reference to the surface area), on which there was a dwelling house, and the other an interest in the Blue Dick. This evidence was insufficient to present a question of fact for the jury under the law applicable.

We reiterate the rule as laid down, after a careful review of the authorities, in *Brownfield* v. *Bier*, 15 Mont. 403, 39 Pac. 461, that to meet the designation ''known'' veins or lodes mentioned in section 2333, Revised Statutes of the United States, veins or lodes within the boundaries of a placer claim at the time of the application for a patent therefor, which should be excepted from a patent issued thereon, must, at the time of the said application, have been clearly ascertained, and must have been of such an extent, character, and value as to justify their exploitation. Conceding everything as proven which can in any possible view of the evidence be regarded as

advantageous to respondents, we are still of opinion that they
clearly failed to make out their case.  It follows that the
special findings of the jury did not justify the general verdict
and judgment.  There was hardly any temptation to Black,
when he applied for a patent, to perpetrate a fraud on the
government.  By paying $10 more for the four-acre placer,
he could have had any quartz leads thereon specifically con-
veyed to him.  Mr. Justice Field, stating the law as to pre-
sumptions in favor of government patents, says, in his dissent-
ing opinion in the Mike & Starr Gold & Silver Mining Com-
pany case, *supra:*  "The presumption in favor of its validity
attends the placer patent, as it does all patents of the govern-
ment of any interest in the public lands which they purport to
convey.  So potential and efficacious is such presumption that
it has been frequently held by this court that if, under any
circumstances in the case, the patent might have been right-
fully issued, it will be presumed, as against any collateral
attack, that such circumstances existed.  (*Smelting Company* v.
*Kemp*, 104 U. S. 636, 646.)  As was said by the circuit court
in the *Eureka Consolidated Mining Company* case, 4 Sawy.
302, Fed. Cas. No. 4,548, a patent for a mining claim is iron-
clad in its potency against all mere speculative inferences."
The tendency of the later decisions of the federal courts is to
uphold the presumptions in favor of placer and townsite pat-
ents more carefu.ly than appears to have been done in some of
the earlier decisions of those courts in conflicts between such
patents and subsequently located quartz lodes.  This is partic-
ularly noticeable in the late case of *Dower* v. *Richards*, 151
U. S. 658, 14 Sup. Ct. 452.  Perhaps one reason for this is
the fact that it has not infrequently happened, in cases involv-
ing such conflicts, where the ground in dispute lies within an
inhabited portion of a town or city, that the courts have been
appealed to and compelled to determine them under the rules
of law governing mineral locations, while underlying the appar-
ent issue the real source of controversy was the desire to
acquire title to land only nominally valuable for mining pur-
poses.  Whether this is true or not, however, in all such cases

where persons locate a quartz lode within a placer claim which lies in a town or city, or in a townsite, subsequent to the application for a patent to the one or the other, the evidence as to the existing known lead justifying a decision in favor of the quartz lode claimants should be clear and convincing, and not made up of surmise or mere personal impressions and beliefs. Were this not true, honestly acquired town-lot titles in populous mining towns and cities, based on such patents, would be constantly in jeopardy, and subject to possible attack at any time when, in the digging of a cellar or the foundation for a house, a vein of quartz should be disclosed. The upsetting of vested rights to such realty, years after the patents under which they have been acquired were applied for, should never be encouraged or tolerated when based on frivolous or insufficient grounds. In the enactment of the mineral laws, congress never contemplated any such result.

Respondents pleaded the statute of limitations as against plaintiffs, but, inasmuch as they have themselves abandoned this phase of the case, we need not discuss it. Numerous other errors are assigned, particularly in reference to the instructions given by the lower court. But these also it is unnecessary to pass upon. The judgment is reversed, and the cause remanded, with directions to the district court to grant a new trial.

*Reversed and remanded.*

HUNT, J., concurs.    PEMBERTON, C. J., not sitting.