MILTON H. WILSON, ET AL., RESPONDENTS, *v.* B. HARRIS, ET AL., APPELLANTS.

[Submitted Feb. 24, 1898. Decided Aug. 1, 1898.]

*Equity—Jurisdiction—Creditors' Suit—Prerequisites—Pleading—Evidence—Admissions—Witnesses—Assignments for Creditors—Preferences—Fraudulent Conveyances—Agency—Garnishment—Property Subject.*

1. In suits brought for the purpose of obtaining equitable relief only, the court should determine *in limine* whether the facts stated are sufficient to warrant the invocation of the extraordinary powers, and the exercise of the peculiar jurisdiction, of chancery; and hence the court must decide whether the complaint states a cause of action cognizable in equity.

2. A lien on personal property capable of manual delivery, in possession of a transferee under a conveyance alleged to be fraudulent as to creditors, is not acquired by service of garnishment on the transferee, since the Code of Civil Procedure (Comiled Statutes of 1887) Section 186, Subdivision 3, provides that personal property capable of manual delivery shall be attached by taking it into custody.

3. Code of Civil Procedure (Compiled Statutes of 1887) Section 188, providing that the sheriff, on receiving information in writing that any person has personal property of defendant in his possession. shall serve on such person a copy of the writ, and notice that the property is attached, and section 190, providing for the examination under oath of one in possession of a debtor's property capable of manual delivery, and empowering the court to order same delivered to the sheriff, whose duty it would then be to attach the same, do not authorize the garnishment of a transferee of property capable of manual delivery under a conveyance fraudulent as to creditors.

4. In a creditors' suit, when the question is as to a lien claimed by plaintiffs by virtue of garnishment proceedings, an averment that any moneys, goods and effects in possession of the garnishee have been attached, which omits to state that the garnishee had such property in his possession at the time of service, is insufficient.

5. Property of a debtor, subject to execution, in possession of an assignee under a conveyance void as to creditors, may not be reached through proceedings in equity until such creditors have obtained a specific lien on the property.

6. Code of Civil Procedure (Compiled Statutes of 1887) Section 356, relating to supplemental proceedings, provides that, if it appear that a person having property of the debtor claims an adverse interest therein, the court may authorize the judgment creditor to sue to recover such interest, and may forbid a transfer thereof until an action can be commenced and prosecuted to judgment. *Held*, that the necessity of

obtaining a lien on property capable of manual delivery, in possession of an assignee under an assignment alleged to be in fraud of creditors, before suit to subject such property to the claims of creditors, is not obviated by an order of court in supplemental proceedings authorizing such suit, nor does the order protect the complaint in such suit from attack for want of equity, as construed by the rules applicable to similar suits not preceded by such order.

7. The burden of proving that a preference in a deed of assignment is fraudulent rests on the party so charging.

8. The mere fact that the relationship of parent and child exists between an assignor and a preferred creditor is not a badge of fraud.

9. In an action by creditors, attacking a sale by a mother to her daughter, proof that the mother was indebted to the daughter in a certain amount is not overcome by statements made by the mother's agent to mercantile agencies which made no specific mention of the indebtedness.

10. In a suit by creditors to have a sale of a stock of goods from a mother to her daughter set aside, it is not sufficient evidence of fraud that a son, as agent for both parties, negotiated the sale, and was afterwards in the employ of the daughter.

11. An admission by an assignor, through her agent, that a sale was not *bona fide*, made in a matter which was beyond the scope of the agent's authority, not relevant to any transaction then pending, and not referring to property in the agent's possession, should be excluded.

12. Evidence brought out on a proper cross-examination is part of the evidence given in chief for the party calling the witness.

13. The assignment of the subject matter of an agency by a principal for the benefit of creditors revokes the authority of the agent, unless that authority is coupled with an interest.

14. The good faith of an assignment for the benefit of creditors is not impeached by contradictory testimony as to acts and declarations of others subsequent to the assignment, and not participated in by the assignor.

15. A written contract attended with every presumption of validity, will not be avoided on the ground of fraud, unless the proof thereof be clear and distinct.

On rehearing.    Reversed.

For former opinion, see 19 Mont. 69, 47 Pac. 1101.

Statement of the facts by the justice delivering the opinion.

Creditors' bill to avoid an assignment for the benefit of creditors made by Bathsheba Harris to Moses Morris.

Bathsheba Harris on December 14, 1891, made a general assignment for the benefit of her creditors, with preferences declared in favor of certain creditors, among whom were her daughter, Annie Harris, and her daughter-in-law, Sarah S. Harris, wife of Ben E. Harris.

From September, 1884, to October, 1891, the assignor conducted a clothing business, through the agency and management of her son, Ben E. Harris, at No. 19 North Main street, in Helena, Mont., and from October, 1891, until the time of the assignment the business was conducted in the same way at

No. 119 North Main street, in the city named; a portion of the stock in question formerly carried at the old place of business having been removed to the new place of business, and the remainder having been left at the old stand. The defendants and appellants claim that the goods left at No. 19 had been sold by the assignor to the defendants, Sax & Zekind, a partnership composed of Salina Sax, daughter of the assignor, and Carrie L. Zekind, while plaintiffs assert that the alleged sale was merely a device to conceal the continued ownership of the assignor, and made in contemplation of a subsequent assignment. Immediately after the assignment, all of the goods at No. 119 North Main street were delivered by Ben E. Harris to defendant, Moses Morris, as assignee, who subsequently sold a large portion of the goods, and collected some of the accounts, but ultimately disposed of the entire remnant of the stock of goods, and all the uncollected accounts, in bulk, to H. L. Frank, a wholesale liquor dealer, then residing in Butte.

The good faith of the assignee is conceded, but plaintiffs claim that the real purchaser at the sale to Frank was the assignor, Bathsheba Harris.

Within a few weeks after the assignment, each of the plaintiffs commenced an action in the district court of Lewis and Clarke county against the assignor, and caused a writ of attachment to be issued, directed to the sheriff of that county; and thereafter the sheriff attached under each of the writs all moneys, goods, effects, and debts due or owing, and other personal property belonging to the assignor, in the possession and under the control of defendants Sax & Zekind and the defendant Moses Morris, by delivering to each of the defendants personally a copy of each of the writs of attachment, with a notice in writing appended thereto that such credits, debts and property were thereby attached in pursuance of said writ. Subsequently each of the plaintiffs recovered a judgment against the assignor in each of said actions, and caused a writ of execution to be issued upon each of the judgments, which writs were returned by the sheriff wholly unsatisfied. After

the return of the execution issued upon one of the judgments, plaintiffs therein applied to the district court where the judgments were entered, by proceedings pursuant to the provisions of the compiled statutes then in force; and after the usual examination, it appearing therefrom that defendants Sax & Zekind and defendant Morris each claimed an interest in the property in their possession sought to be reached through said proceedings, an order was made and entered by the court authorizing plaintiffs to institute a suit against Morris and Sax & Zekind to recover such interest in the property so claimed by them; the said defendants being by said order restrained from disposing of any of the property until that action had been prosecuted to judgment, or until otherwise ordered.

This suit was then commenced. The complaint, after reciting the commencement of each of said actions, the levying of the writs of attachment in the manner hereinbefore stated, the issuance and return wholly unsatisfied of each of the executions, and the supplementary proceedings in one of the actions, further alleges that the assignment was fraudulent and fictitious, and was made for the purpose and with the intent of hindering, delaying, and defrauding the plaintiffs and other creditors of the assignor; that the assets in the possession of the assignee were insufficient to pay the preferred claims; that the assignor at the time of the making of the assignment was the owner of a stock of goods in Helena worth many thousands of dollars, which she did not turn over to the assignee, but which she fraudulently claimed to have sold to defendants Sax & Zekind before the assignment was made, and that such transfer was made without any consideration, for the purpose and with the intent of hindering, delaying, and defrauding plaintiffs and others of her creditors; that the assignor retained in her possession and under her control other property which was not by law exempt from execution, for the purpose of gaining a benefit for herself, and with the intent to hinder, delay, and defraud the plaintiffs and other creditors of hers; that the alleged indebtedness of the assignor to her daughter, Annie Harris, and her daughter-in-law, Sarah S. Harris, preferred

under the assignment, was pretended and fictitious, and was inserted in the assignment for the purpose of consuming the proceeds of said property; that the assignor retained in her possession a large sum of money for the purpose and with the intent of hindering, delaying, and defrauding her creditors and that the assignor purchased from the plaintiffs and other persons large quantities of goods, worth many thousands of dollars, without any intention of paying for them.   Plaintiffs prayed that the assignment be declared fraudulent and void as to them; that the defendants, Sax & Zekind and Moses Morris, be required to account for all the property that had been received by them from the assignor, and that all of the defendants be restrained by injunction from interfering with said property; and that the plaintiffs' judgment be satisfied out of said property.

The answers deny all the material allegations of the complaint, except those reciting the institution of the several suits, the levying of the writs of attachment by the garnishments, the issuance and return of the executions, and the supplementary proceedings.   In the separate answer of defendants Sax & Zekind it is alleged that Salina Sax advanced and loaned to the assignor, her mother, at different times, in various amounts, the total sum of $11,800, for which the assignor agreed to pay and did pay $150 per month; that a few months prior to the assignment the assignor sold to Mrs. Sax the stock of merchandise at No. 19 North Main street, and credited the amount of her advances upon the purchase price of the stock; that the assignor's indebtedness to Salina Sax was thus fully settled by the sale, made in good faith; and that Salina Sax thereafter failed to assert any further claim against the assignor, or any right to participate in the assigned estate.

The case was twice tried in the district court.   The first trial resulted in a disagreement and discharge of the jury. When counsel for plaintiffs opened the case upon the second trial, they stated that, as there were sufficient funds in the hands of the assignee to pay the plaintiffs' judgments, they would

not ask any decree as against defendants Sax & Zekind, or as to the property in their possession which had been garnished, though they did not abandon any of the issues raised by the pleadings as to the fraudulent or fictitious character of the alleged sale by the assignor to those defendants. The defendants objected to the introduction of any evidence, on the ground that the complaint did not state facts sufficient to constitute a cause of action; and, upon this objection being overruled by the court, they excepted. During the trial the defendants reserved exceptions to the rulings of the court in admitting certain of plaintiffs' proofs, in overruling defendants' motion to strike certain of plaintiffs' evidence, in denying defendants' requests for instructions to the jury, and in giving the instructions which were given. The jury made special findings, all of which were adopted by the court, except one, which was set aside, and a new finding made by the court in lieu thereof. The court also made other special findings, which need not be noted here, as they will be set out in the opinion.

As conclusions of law, the court found: (1) "That the assignment alleged to have been made by the defendant B. Harris to the defendant Moses Morris is void; the same having been made for the purpose of hindering, delaying, and defrauding creditors." (2) "That each of the plaintiffs is entitled to a lien upon the funds in the hands of the defendant Moses Morris, by virtue of the execution by garnishment of the several attachments as hereinabove set forth ; that they are each severally entitled to a lien by virtue of the service of garnishment notices upon the defendant Moses Morris upon the executions issued as hereinabove set forth; that each of said plaintiffs are entitled to liens upon said funds in the hands of said defendant Moses Morris by virtue of the filing of the complaint of the plaintiffs, and of the complaints of intervention; that said last liens became operative from the date of the filing of said complaints."

Judgment was accordingly entered for the plaintiffs, and the defendants have appealed from the judgment, and also from an order refusing a new trial.

The judgment and order appealed from were affirmed by an equally divided court in *Wilson* v. *Harris*, 19 Mont. 69, 47 Pac. 1101, a rehearing was granted, and the case has been re-argued and submitted for decision by a full bench.

*H. G. McIntire* and *Thos. C. Bach*, for Appellants.

It is not every transfer of property made by a debtor, even though made without consideration or otherwise fraudulent, that a creditor can assail. So long as such transfer does not deprive the debtor of the means of satisfying his creditor's claims, the creditor has no ground for complaint. Succinctly stated the rule is, no person can complain in equity of the fraudulent practices of another unless he has been injured by such practices. Therefore it becomes incumbent upon a creditor seeking equitable relief, to both allege and prove that the debtor has no property to which recourse can be had except that covered by the alleged fraudulent conveyance. A complaint lacking this essential allegation is not even cured by evidence and it may be objected to at any time. (Wait on Fraud. Con. and Creditors' Bills, Secs. 140, 143, 296; 2 Boone's Pleadings, p. 132, note 4; Freeman on Executions (1st Ed.) Sec. 426; 2 Estee on Pleadings, Sec. 2571; *Massey* v. *Gorton*, 90 Am. Dec. note on p. 298; *Emery* v. *Yount*, 7 Colo. 107; *Harris* v. *Taylor*, 15 Cal. 348; *Castle* v. *Bader*, 23 Cal. 78; *Patterson* v. *Donner*, 48 Cal. 369; *Wagner* v. *Law* (Wash.), 28 Pac. 1113; *Hamilton Brown Shoe Co.* v. *Adams* (Wash.), 32 Pac. 93; *Botcher* v. *Berry*, 6 Mont. 451; *Taylor* v. *Johnson* (Ind.), 15 N. E. 238; *Sell* v. *Bailey* (Ind), 21 N. E. 338; *Kain* v. *Larkin* (N. Y.), 30 N. E. 106; *Platt* v. *Schreyer*, 25 Fed. note on p. 87; *Buckeye Engine Co.* v. *Donau Brewing Co.*, 47 Fed. 6; *Kettel* v. *Augusta T. & G. R. Co.*, 65 Fed. 862–3; *Basset* v. *Orr*, 7 Bissell 301; *Christopher* v. *Christopher* (Md.), 3 Atl. 296–299; *Dunham* v. *Cox*, 10 N. J. Eq. 467; *Noble* v. *Hines*, 72 Ind. 15; *Hogan* v. *Robinson*, 94 Ind. 145; *Clarke* v. *Burt* (Kan.), 42 Pac. 733.) One who comes into a court of equity should be willing to do equity. In this case by their own showing plaintiffs had

either the option of pursuing property worth fully $18,000 which, as they claim, and as the court found, was in the actual possession of this judgment debtor and within the jurisdiction of the court rendering their judgments, which did not exceed in the aggregate one-half of the value of said property, or of pursuing property which had been transferred to the assignee defendant for the purpose of paying unquestioned and *bona fide* debts. It is elementary law that the acts and declarations of an assignor made prior to the making of an assignment and not in contemplation of the same and which do not constitute a part of the *res gestae* are inadmissable to impeach the good faith of the assignment subsequently made. If this action had been brought by a vendor to recover the property which he sold by reason of the alleged fraudulent statements of Ben Harris to the various mercantile agencies these declarations might have been relevant because they would tend to show the representations made for the purpose of defrauding that particular creditor in the purchase of those particular goods; but here the testimony was introduced to show not a fraud in the purchase of these goods, but a fraud in the making of an assignment for the benefit of creditors made several months thereafter. That the court attached some importance to this character of testimony is apparent from the fact that it incorporated the result of the testimony in one of its findings. For the same reason all the testimony concerning the Sax & Zekind Famous Clothing Concern was improperly admitted, and all other transactions prior to the assignment, all of which were objected to. (*Bush* v. *Roberts*, 111 N. Y. 278, S. C. 18 N. E. 732; *Truax* v. *Slater*, 86 N. Y. 632; *Bixby* v. *Corskadon*, 70 Iowa 726; *Staples* v. *Smith*, 48 Me. 470; *Flagler* v. *Schoefel*, 40 Hun. 178; Burrill on Assignments, 6th Ed. p. 442; *Button* v. *Richards*, 70 Wis. 272; *Button* v. *Smith*, 62 Wis. 92; *Wilson* v. *Berg*, 88 Pa. St. 167.)

It is also elementary law that acts and declarations of an assignor made subsequent to the assignment are inadmissable to impeach the assignment in the absence of a conspiracy between the assignor and assignee. *A fortiori* should this rule

be applied to the acts and declarations of a former agent of the assignor—one whose agency as appears by plaintiff's own testimony ceased the day after the assignment.  If fraud there was, it was a fraud against the assignment and not in the assignment—the fraud originating after the assignment and not having its existence at the time of the assignment.  (Wait on Fraud. Con. Sec. 278; Burrill on Assignments, 6th Ed. Sec. 362 *Kain* v. *Larkin*, 131 N. Y. 300; *Bixby* v. *Carskadon*, 70 Iowa 726; *Wilson* v. *Berg*, 88 Pa. St. 167; *Sullivan* v. *Smith*, 19 N. W. Rep. 620; *Cuyler* v. *McCartney*, 40 N. Y. 223; *Williams* v. *Robins*, 15 Gray 590; *Moag* v. *Farley*, 79 Ala. 246.)

*McConnell, Clayberg & Gunn*, for Respondents.

Where a party makes a general assignment purporting to convey all of his property, and retains property of a substantial value which he does not deliver under the assignment, it is conclusive evidence of a fraudulent intent in making the assignment.  (*Coursey* v. *Morton*, 132 N. Y. 556; *Baun* v. *Pierce*, 7 So. 548; *Aylesworth* v. *Dean*, 12 Pac. 241; Burrill on Assignments, Chap. 19; *Smith* v. *Mitchell*, 12 Mich. 180; *Farrington* v. *Sexton*, 43 Mich. 454; *Merchants' National Bank* v. *Greenhood*, 16 Mont. 395.)  It should also be remembered that there was an issue in this case as to the indebtedness of B. Harris to Mrs. Sax.  The statements introduced were competent as bearing on this issue.  (*Shauer* v. *Aterton*, 151 U. S. 607; *English* v. *Friedman*, 12 So. 252; see also *Josephi* v. *Mady Co.*, 13 Mont. 195.)  It cannot be controverted that where a person, a short time prior to making a general assignment, purchases a large amount of property without any intention of paying for same, such conduct constitutes, to say the least, a badge of fraud.  (See Bump on Fraudulent Conveyances, 4th Ed. Chap. 12.)  The acts, conduct and statements of Ben E. Harris with reference to the Sax & Zekind property while in possession of the same were cleary admissible.  (*Garr, Scott & Co.* v. *Shaffer*, 36 N. E. 208; *Rosenberg* v. *Burnstein*, 61 N. W. 684; *Murphy*

*v. Mulgrew*, 102 Cal.. 547; *Redfield* v. *Buck*, 95 Am. Dec. 241; *Grant* v. *Lewis*, 14 Wis. 487; *Smith* v. *Boyer*, 26 Am. St. Rep. 373; *McDowell* v. *Goldsmith*, 61 Am. Dec. 305; *Martin* v. *Hardesty*, 62 Am. Dec. 773; *Tyres* v. *Kennedy*, 26 N. E. 394; Bump on Fraudulent Conveyances, 4th Ed. Sec. 600.)

Reply of Appellants:    A party is not bound by the answer of his own witness to such an extent that he cannot show by other witnesses a fact to the contrary, but we respectfully submit that when the plaintiffs in this case proved by Ben Harris that he ceased to be the agent of Mrs. Harris the day after the assignment, that that fact is a fact in this case until somewhere in the record the contrary appears.    Neither directly nor indirectly does it appear in this case that Ben Harris was his mother's agent at any time succeeding the day after the assignment, so that even upon this proposition alone we submit that the acts and declarations of Ben Harris after the assignment were improperly admitted in this case.    (*Casey* v. *Thieviege*, 19 Mont. 341, 48 Pac. Rep. 397.)    The Sax & Zekind property did not belong to Mrs. B. Harris at the date of the assignment whether the disposal was fraudulent or not.    When A. disposes of property fraudulently to B., the property is B.'s as against A.; at any rate such property could not be included in a general assignment for the benefit of creditors.    A. could not sue B. to regain the property.    That proposition is elementary.    And a prior fraudulent assignment or transfer does not of itself make a subsequent assignment fraudulent.    (See *Estes* v. *Gunter*, 122 U. S. 450; *Crawford* v. *Neal*, 144 U. S. 585; *Deere* v. *Lasy*, 67 N. W. Rep. 462.)    All of the testimony referring to the disposal of that property by Moses Morris, by H. L. Frank and by B. Harris, after the assignment, was improperly admitted.    Even conceding that Ben Harris was the agent of Mrs. B. Harris, that she was the actual purchaser of the property herself, still that possession was not such a possession as forms the basis for the rule that

the testimony of subsequent acts can be admitted in evidence because the assignor is in possession. The character of the possession which forms the exception to this rule must be a possession under the same title which the assignor had at the time of the assignment. It cannot be a title derived from an honest assignee under or through a sale made by him; otherwise no assignment could remain valid where an assignor after having assigned his property saw fit to purchase some of it at a sale by the assignee. We submit that Mrs. B. Harris had the right to buy from the assignee herself if she saw fit to do so, and that her purchase of the same could not invalidate this assignment. (See *Tilson* v. *Terwilliger*, 56 N. Y. 274; *Coyne* v. *Weaver*, 84 N. Y. 392.) In order to allow the acts or declarations of an assignor in evidence against the assignment they must form a part of the *res gestae*; and that means they must be acts contemporaneous with the assignment and made in contemplation thereof. For a definition of *res gestae* see *Tilson* v. *Terwilliger*, *supra;* *Crawford* v. *Neal*, *supra;* *Estes* v. *Gunter*, *supra;* *Coyne* v. *Weaver*, 84 N. Y. 392; *Flannery* v. *Tassel*, 30 N. E. (N. Y.) 246; *Ford* v. *Williams*, 13 N. Y. 576. Although an error in the admission of evidence in a suit in equity will not ordinarily justify a reversal, yet where it appears from the record that the court below considered the testimony so important that it made the same the basis of a finding of fact, then the appellate court cannot consider that the error was not prejudicial. (*Bush* v. *Roberts*, 111 N. Y. 278.)

PIGOTT, J. Defendants specify 93 errors of law, and 34 particulars in which the evidence is claimed to be insufficient to justify the findings. Many of the questions presented are difficult of solution, and have received from us the painstaking examination and attentive consideration which their importance demands.

1. The first error assigned is the action of the court in overruling defendants' objection to the introduction of any evidence. It is contended that the complaint is fatally defect-

ive because it omits to charge the insolvency of Bathsheba Harris, and her lack of property other than that covered by the alleged fraudulent sale and assignment. We refrain from expressing an opinion as to the sufficiency of the complaint in this respect. If it be defective in the particular mentioned, the answers doubtless supplied the omission, and so cured the defect. (*Crowder* v. *McDonnell* (this day decided by this court), 54 Pac. 43; *Hamilton* v. *Great Falls Railway Co.*, 17 Mont. at page 341, 42 Pac. 860, and 43 Pac. 713; Pomeroy on Remedies, Sec. 579; *Shively* v. *Land and Water Co.* (Cal.) 33 Pac. 848.) This supposed defect in the complaint is the only specific ground presented in this court by defendants' counsel, in their briefs and oral arguments, in support of the objection to the introduction of evidence because of the want of equity in the complaint; but, notwithstanding this seeming waiver of any other defect in the complaint, we feel that the court cannot regard the silence of counsel as a restriction upon the legal scope of their general objection. If plaintiffs had a plain, adequate and complete remedy at law, a court of equity should refuse to take jurisdiction; and, indeed, it would be without jurisdiction, for equity may act in those matters only in which no remedy is afforded in the ordinary course of law, or in which the remedy at law is deficient. The court must therefore in every suit brought to invoke the aid of its chancery powers, determine *in limine* the question whether or not it has jurisdiction; and hence we must decide whether for any reason the complaint fails to state facts sufficient to constitute a cause of action.

When Bathsheba Harris made the assignment, plaintiffs were general creditors of the assignor. They had no lien upon or charge against any of her property; nor did they have an interest under any trust, declared or created, in any way touching the property. Plaintiffs allege, however, that their debtor fraudulently, and for the purpose of hindering, delaying and defrauding them, transferred and delivered to the assignee a portion of her property in trust for the benefit, practically, of some only of her creditors, and attempted to screen

the remainder of her assets by various contrivances, the boldest of which was a fictitious or colorable sale to her daughter of a large and valuable stock of goods, which was delivered to the pretended purchaser a few months before the assignment, and was in her possession at the date thereof. Plaintiffs further state that almost immediately after the assignment they commenced actions against the assignor in the district court, and after the issuance of summons caused a writ of attachment to be issued in each action, which writs were executed by the sheriff through a levy by garnishment on all the effects in the possession of the assignee, and all in the possession of the pretended purchaser; that a judgment was subsequently entered in each of the actions in favor of plaintiffs and against the assignor, and that an execution issued thereon, and was returned as wholly unsatisfied; that thereafter, in one of the actions, proceedings supplemental to the execution were instituted, which resulted in an order of the court directing plaintiffs to bring an action to determine the interests of defendants in the property sought to be reached.

Are these allegations sufficient to entitle plaintiffs to the aid of a court of equity to investigate the proceedings whereby the debtor attempted to dispose of her property? If true, would they warrant such a court in enforcing the application of that property to the payment of plaintiffs' judgment? As all the property involved is personalty, it is manifest that no lien thereon resulted from either the judgments obtained by plaintiffs, or the executions issued and returned unsatisfied. If, therefore, we should decide that it was necessary for plaintiffs to obtain a lien of some sort upon the property, as a prerequisite to a resort to equity for the enforcement of their supposed rights, we must look for that lien as the result of the levying of the attachments issued in plaintiffs' actions against the assignor, since there are no other proceedings shown by the record whereby any such rights were secured, or attempted to be secured, for plaintiffs.

Did plaintiffs, by the attachment levies set out in the complaint, secure a lien upon any of their debtor's property? The

method of executing a writ of attachment was provided by Section 186 of the Code of Civil Procedure (Compiled Statutes of 1887), then in force.

The subdivisions of that section applicable to these supposed levies are as follows: "Third. Personal property capable of manual delivery shall be attached by taking it into custody." "Fifth. Debts and credits, and other personal property not capable of manual delivery, shall be attached by leaving with the person owing such debts, or having in his possession, or under his control, such credits and other personal property, or with his agent, a copy of the writ, and a notice that the debts owing by him to the defendant, or the credits and other personal property in his possession, or under his control, belonging to the defendant, are attached in pursuance of such writ."

"Property," in its appropriate sense, denotes the interest one may have in lands or chattels to the exclusion of others (*Ayers* v. *Lawrence*, 59 N. Y. at page 198; *Chicago & W. I. R. Co.* v. *Englewood R. R. Co.*, 115 Ill. at page 385, 4 N. E. 246; *Denver* v. *Brayer*, 7 Colo. 113, 2 Pac. 6), although the word is frequently employed to indicate the subject of the property, rather than the property itself. (19 Am. and Eng. Ency. Law, 284.) A chattel may be the subject of distinct properties held by several persons. One may have the right to possession or use, or both, while another holds the legal title to the corporeal thing, subject to the interest of the possessor. The one has the special, and the other the general, ownership. The one has the right to the chattel, and the other an interest in it. The right or interest of each is his personal property. Where one person is possessed and entitled to possession of a chattel which is owned by the debtor, or in which he has an interest, the "personal property" subject to attachment as that of the debtor is the interest of the debtor in the chattel, and is not the *res* itself. The chattel so owned may be, and usually is, capable of manual delivery, but the present possession and right thereto are not in the debtor. In such case the interest of the debtor in the chattel existing *in*

*præsenti*, but to be enjoyed *in futuro* as a right to it, is not capable of manual delivery; nor is the chattel itself, the seizure of which cannot be made without invading and disregarding the right of the possessor, so capable, within the meaning of the statute. That this must, in the nature of things, be true of such property, and that garnishment is the mode of attaching it, seems evident. But where the present right to the chattel, as well as the ownership of it, is in the debtor, then, at least, the personal property—the chattel—is capable of manual delivery, unless physical conditions prevent—as, for example, in the case of a growing crop. (*Raventas* v. *Green*, 57 Cal. 254.) In subdivisions 3 and 5 of section 186 a clear distinction is drawn between the method of attaching personal property capable of manual delivery, and that to be pursued in attaching debts, credits, and other personal property incapable, for any reason, of manual delivery; and the distinction seems to be recognized in *Brownell* v. *McCormick*, 7 Mont. 12, 14 Pac. 651, where the court say: "Where property which is sought to be attached, belonging wholly to the debtor, is in the lawful possession of another, proceedings must be had by service upon such other person of a copy of the writ, and the notice required in Section 186, Div. 1, Revised Statutes of 1879 (Section 188, Compiled Statutes of 1887)—in other words, by garnishment."

It is nowhere claimed that any of the property sought to be levied upon in the case at bar was attached by actual seizure, or by "taking it into custody;" nor does it appear, even inferentially, that any of the property was not capable of manual delivery. Hence, as to "personal property capable of manual delivery," we must assume that the sheriff proceeded under the provisions of the fifth subdivision above quoted, which indicates the mode of levying upon "debts, credits and other personal property not capable of manual delivery." We are not now considering a case wherein it appears or is claimed that the property of the debtor is, as to plaintiffs, in the rightful possession or under the rightful control of a third person. Plaintiffs allege, in substance, that the "personal property ca-

pable of manual delivery," which was in the possession of the assignee, was delivered to and held by him under a conveyance which was a fraudulent and void attempt to cheat plaintiffs and other creditors of the assignor, and that the sale of property claimed by, and to be in the possession of, Sax & Zekind, was a mere pretended and colorable sale, under which the full ownership and possession remained in the assignor, and that such pretended sale to Sax & Zekind was a mere contrivance to deceive and defraud the creditors of the real owner and possessor.

Assuming the averments of the complaint with reference to the property and the character of defendants' possession of it to be true, we cannot doubt plaintiffs' right to require the sheriff to execute the writ upon the property by an actual seizure of the chattels themselves; that is to say, by taking them "into custody," as provided by statute. Confronting us, therefore, is the serious question whether the garnishment proceedings created any new right in plaintiffs concerning the specific personal property sought to be affected, for the enforcing whereof they may successfully invoke the aid of equity. The precise question is one of first impression in this court. In *Merchants' National Bank* v. *Greenhood*, 16 Mont. 397, 41 Pac. 251, the allegations of the complaint with reference to the attachment were "that on the 15th day of February, 1892, the sheriff, by virtue of the power and authority vested in him as such officer, and under and by virtue of said writ of attachment, did levy upon and seize and take into his possession that certain stock of goods, wares and merchandise situate and being in that certain store building on South Main street, in the city of Helena, known and designated as 'No. 24,' and by garnishment levied said attachment upon all the money and other property and effects of said Greenhood, Bohm & Co. in the hands of the defendant Max Kahn, assignee." It is therefore apparent that, whatever application of the principles announced in that case may be made to the one now before us, there existed a feature in that controversy distinguishing it from that at bar, unless the garnishments

herein referred to accomplished the same result and produced the same legal status as the attachment by actual seizure shown in the Greenhood case. In *Montana Nat. Bank* v. *Merchants' Nat. Bank*, 19 Mont. 589, 49 Pac. 50, the learned justice, in delivering the opinion of the court, used the following language: "As to a chattel capable of manual delivery, in the possession of a garnishee, we cannot agree with appellants that no lien results from the garnishment. An inchoate lien or right is acquired by garnishment as to such chattels. In this case, however, a debt was garnished, and just what right in connection with the property of the garnishee was acquired by virtue of the garnishment is a question of difficulty." From the statement just quoted, that "in this case, however, a debt was garnished," it is clear that the remarks with reference to the effect of a garnishment upon chattels in possession of the garnishee were made with reference to a point not involved in the controversy then under consideration, and were wholly unnecessary to the complete determination of the rights of the parties concerned. We take occasion to observe, also, that an examination of the facts in the case last cited, and of those cited in support of the dictum of the able justice, discloses that the garnishee had rightful possession of the "debts, credits and other personal property," and that no question was raised touching the effect of a garnishment upon property in possession of persons asserting ownership under attempts, fraudulent and void as to creditors, to unlawfully conceal or improperly dispose of the debtor's assets. In each of the Nebraska cases referred to by Mr. Justice Buck in that case, the garnishee was a chattel mortgagee, rightfully in possession under the mortgage, and the assets sought to be reached by the garnishment were such of the mortgaged goods belonging to the debtor as might not be required for the satisfaction of the prior claim of the mortgagee in possession. While, therefore, it is unnecessary to criticise or question the reasoning of the opinion or the result reached in that case, we do not recognize it as deciding that a lien is acquired by service of garnishment upon one who is fraudulently in the open possession

of chattels belonging to the debtor, and whom the debtor has put into possession for the purpose of concealing assets properly applicable to the claims of the debtor's general creditors. The manifest policy of our law is to extend to chattel property as much freedom of transfer as is consistent with a reasonable regard for the rights of those who, from the necessities incident to commercial business, trust to the character and good faith of customers, and fail to require and obtain other security for their obligations. Creation of liens upon such property by mortgage, by pledge, and to some extent by contract reserving title or interest even after delivery, is permitted, but in all cases our laws demand the strictest adherence to whatever statutory conditions are imposed upon the favored few who claim the benefit of the privileges thus sought to be conferred, and whenever, under any circumstances, a statutory lien upon personal property is asserted, the burden of showing full compliance with the statutory provisions is upon those who profess to have restricted for their own benefit the facility for free transfer which the common law recognizes and seeks to encourage.

Under the old system, still in vogue in many eastern and southern states, a writ of execution becomes a lien upon the debtor's chattels at the moment it is placed in the officer's hands for levy; while in Montana, and generally in the younger western communities, an actual levy is an indispensable prerequisite to obtaining a lien by such process. "All liens by attachment shall accrue at the time the property of the defendant shall be attached by the officer charged with the execution of the writs, in the order in which they are levied." (Section 204, Code of Civil Procedure, Compiled Statutes of 1887.) All property may be levied upon under an execution in like manner as upon writs of attachment, and until such levy property is not affected by the execution. (Section 319, Code of Civil Procedure, Compiled Statutes of 1887.) When, therefore, a creditor, who "at the time of issuing the summons, or at any time afterwards," seeks to "have the property of the defendant not exempted from execution attached

as security," he must pursue the statutory method, or else
fail in his attempt to secure an advantage which the law per-
mits, but which it confers upon those only who are careful as
well as diligent; or, in the language of Mr. Justice Harwood,
when speaking of a chattel mortgagee who had not complied
with the statutes:    "If one attempting to create a special lien
in his favor, or to take advantage of one provided by law,
fails to comply with the provisions of the law governing, then
such creditor falls back in the common line occupied by other
general creditors, and cannot invoke the rules or doctrines of
equity to avoid this result." (*Milburn Manufacturing Co.* v.
*Johnson*, 9 Mont. 541, 24 Pac. 18.)

If the general creditor seeks to obtain security by attach-
ment, the statute would seem to afford a clear guide as to the
method of procedure to accomplish that end.    If he seeks a
lien upon real estate, the steps to be taken are clearly indi-
cated; if he seeks a lien upon shares of the capital stock of a
corporation, the law leaves no doubt as to the *modus operandi;*
if he seeks a lien upon "personal property capable of manual
delivery," the statutes require that it "shall be attached by
taking it into custody;" if he seeks to attach ' debts, credits
and other personal property not capable of manual delivery,"
the proceeding usually known as "garnishment" is indicated;
and if he possesses any information as to debts owing by third
persons to the debtor, or as to such property of the debtor
in their custody, section 188 of the statute advises him that
by imparting this information in writing to the sheriff he will
secure the appropriate process for that purpose.    If the gen-
eral creditor seeks to attach property in the possession of a
person other than the debtor, and is in doubt as to the owner-
ship or right to possession of the property, section 190 pro-
vides for the examination under oath of such person respect-
ing the matter, and also for like examination of the debtor
"for the purpose of giving information respecting his prop-
erty," and "the court or judge may, after such examination,
order the personal property capable of manual delivery to be
delivered to the sheriff," whose duty it would then be to at-

tach the property by taking it into custody. By section 193 it is provided that if, after any personal property has been attached, it "should be claimed under oath by a third person as his property," the creditor may, if he considers the claim unfounded, furnish a bond of indemnity to the sheriff, and retain the property under attachment.

Did plaintiffs proceed in conformity with these provisions, and did they obtain an attachment lien upon any property of their debtor? When a general creditor, feeling aggrieved by the provisions for preferences in an assignment, indulges in suspicions, well founded or otherwise, as to the good faith of the assigning debtor, an investigation by a court of equity into the entire financial history of the debtor and his business ventures offers a strong temptation to avoid the usual proceedings by attachment of the goods claimed to have been fraudulently disposed of, and their subsequent sale under execution. The usual steps (or those which were customary until quite recently) involved the practical proof of the creditor's confidence in his claim, which is afforded by the indemnifying bond required by the prudent sheriff, or which, without a bond, is evidenced by the actual seizure of the property, under writ of attachment or execution, as that of defendant, with the resulting cause of action to the real owner, should he prove to be other than the debtor; and hence we find that in many cases the extraordinary powers of chancery are invoked for the mere pur ose of investigation, in the hope of discovering fraud not then known to exist. The proceeding is not very expensive, involves no very great responsibility or risk, and is not infrequently resorted to when unnecessary. But, as full protection is given neither to the debtor nor preferred creditor, we are not disposed to encourage or facilitate such proceedings, unless the facts disclosed by the pleadings bring the case strictly within the well established principles which determine the creditor's right to resort to equity; and the trial court should always require those seeking the exercise of its equity powers to establish clearly the inadequacy of the remedy at law.

In the case at bar, plaintiffs allege that the property of their

debtor was delivered to, and was in the possession of, a grantee, under a conveyance fraudulent and void as to them. If this be true, we can find no authority in the statute sanctioning a mere notice of garnishment upon such a possessor.

Nothing in section 188 declares the effect of the garnishment therein mentioned upon the debts, credits and other personal property owing or belonging to the debtor, and in the possession or under the control of the garnishee. Its language is: "Upon receiving information in writing from the plaintiff or his attorney, that any person has in his possession, or under his control, any credits or other personal property belonging to the defendant, or is owing any debt to the defendant, the sheriff shall serve upon such person a copy of the writ, and a notice that such credits or other property or debts, as the case may be, are attached in pursuance of such writ."

This section was not designed to, nor does it, provide a mode by which personal property may be attached. It does not enlarge the method of attachment prescribed by section 186. It contains no intimation that "personal property capable of manual delivery" can be attached by garnishment. Section 186 prescribes the several appropriate modes in which the writ shall be executed upon different classes of property, and these modes are exclusive. (*Kiesel* v. *U. P. Ry. Co.* (Utah), 21 Pac. 499.) It declares that the act necessary to an attachment of personal property capable of manual delivery is actual seizure; such property shall be attached by taking it into custody. Section 188 indicates a mere procedure to be adopted by a creditor who would avail himself of the right to secure an attachment under, and upon property of the kind described in, section 186. It relates exclusively to the duty of the sheriff under the circumstances therein recited, and hence, if its language refers in uncertain terms to conditions which have been specifically described and declared in the prior section, we must look to those prior provisions for the explanation of any doubtful language in section 188, rather than regard these incidental references as modifications of the distinct declara-

tions of the earlier section. Section 188 is not intended as a
legislative enactment as to when an attachment may be issued
or levied, upon what it may be levied, or how it is to be levied
upon any class or kind of property. These subjects will be
found fully acted upon elsewhere. This section merely makes
it the duty of the sheriff to levy by garnishment when notified
in writing that property subject to garnishment is within the
reach of that process, as provided by the prior section; and
hence, keeping in view this purpose of section 188, it seems
quite clear that its somewhat loose language cannot operate to
enlarge the scope of its action, and convert it into an amendment
of the previous provisions. On the contrary, it should be
held to mean that which is in harmony with the clearly de-
fined limits of the process and property to which it refers, as
determined by those earlier provisions which profess to spe-
cifically treat of that subject. Applying these reasonable
rules of construction we find that section 188 can operate only
when the sheriff receives written notice "that any person has
in his possession or under his control, any credits or other"
garnishable "personal property belonging to the defendant."

It is claimed that the provisions of section 190 throw light
upon the meaning of section 188, and warrant a construction
by which personal property capable of manual delivery may
be attached by garnishment. But here, again, in making such
contention, the subject and the object of the section are over-
looked. Section 190 contemplates a condition requiring in-
vestigation as to the status of property in the possession of
third persons, and supposed to belong to the debtor; and it
requires, consistently with the provisions of section 186, that,
if any such property is found to belong to the debtor, the
court may "order personal property capable of manual delivery
to be delivered to the sheriff upon such terms as may be just,
having reference to any liens thereon or claims against the
same," whereas, as to "all other personal property," it re-
quires only "a memorandum to be given  *  *  *  contain-
ing the amount and description thereof." Thus, the distinc-
tion is preserved, and the operation of section 190 results in

an actual seizure by the sheriff, under the direction of the court or judge, of all personal property capable of manual delivery, but in a mere garnishment as to that which is not capable of such delivery. If at liberty to examine all the provisions found in later sections in order to determine the meaning of the plain language of section 186, we may inquire how the sheriff is to sell, under section 192, and as upon execution, personal property capable of manual delivery, supposed to be attached by garnishment; how he is to deliver to a third party claimant, under section 193, personal property capable of manual delivery so attached; and how he is to satisfy the judgment out of garnished personalty under section 194. But each of these sections will be found in perfect accord, the one with the other, and all with the earlier provisions, if each be confined to the sphere of its proper operation as plainly indicated by the purpose sought to be provided for or accomplished by each enactment; and no conflict, or even uncertainty, will arise unless some section is so construed as to make it affect conditions fully covered by other sections, and entirely foreign to the subject treated by its special provisions. The personal property belonging to the defendant, but in the possession or under the control of another, which the plaintiff must attach by garnishment, is the personal property described in the fifth subdivision of section 186 as ''not capable of manual delivery.'' Respondents say that these sections were taken from the practice act of California, and have been the law of that state since 1851 up to the present time. In this they are correct. They suggest that if any doubt existed in respect of the interpretation of the expression ''other personal property,'' used in section 188, some adjudication of the question would be found by the courts of California, where for nearly 50 years the section has been in force; and they cite several cases in which, as they claim, it appears that chattels capable of manual delivery have been attached by garnishing the possessor. (*Dunsmoor* v. *Furstenfeldt*, 88 Cal. 522, 26 Pac. 518, is cited. There the clerk of a court had been ordered to pay to a creditor of an insolvent a certain sum of

of money; and the court held the creditor did not thereby become entitled to, nor did he own, any particular or specific money, but that the clerk was a debtor to him, and garnishment of the clerk as a debtor of such person was upheld. In *Chandler* v. *Booth*, 11 Cal. 342, it seems that the garnishee collected the state controller's warrant for $1,600, which had been delivered to him by the debtor, and out of which the garnishee was to pay certain claims owing by the debtor; and the debt was attached by garnishment. In *Roberts* v. *Landecker*, 9 Cal. 262, the opinion does not contain any intimation as to whether or not the property attached was capable of manual delivery, nor was the question presented. *Raventes* v. *Green*, 57 Cal. 254, is to the effect that a growing crop in the possession of and owned by the debtor is personal property not capable of manual delivery, and is therefore to be attached by process of garnishment served upon him. But the supreme court of that state has considered the question, and decided it. Montana adopted these statutes from California in 1864, and as early as 1856, in *Johnson* v. *Gorham*, 6 Cal. 195, it was held that "the service of a copy of execution and notice of garnishment upon a third person constitutes no lien upon property of the debtor in his hands, capable of manual delivery." Then, as now, property could be subjected to levy on execution only in the manner provided for its attachment. Recognition of this doctrine is found in Freeman on Executions, Section 159, and in Shinn on Attachments, Section 467.

If the assignment was made in good faith, and is free from defects, plaintiffs have no rights at all in or to the assigned property, except to participate in the distribution of the proceeds after liquidation of preferred claims; but if, as alleged, the assignment was a mere contrivance to defraud them, it is void as to them, the property attempted to be transferred by it was still owned by the debtor, the possession of the assignee was without right as to them, and the goods were subject to attachment to the same extent, and in the same way, and only in the same way, as if the assignment had not been made. It is alleged that the assignee was in the possession of

the assigned goods at the time of the attachments, and it does not even appear that they had been converted into money. Assuming the truth of all the allegations of the complaint, we feel compelled to hold that plaintiffs did not, so far as appears, obtain through the garnishments a lien upon any of the property in the hands of the assignee.

Whether a specific lien upon personal property of the debtor, not capable of manual delivery, and in the possession of the garnishee, or upon its proceeds, is created by virtue of the garnishment, is not a question before us, and will not be considered. Among the authorities relating to that question are the following: *McConnell* v. *Denham*, 72 Iowa 494, 34 N. W. 298; *McGary* v. *St. Louis Coal Co.*, 93 Mo. 237, 3 Am. St. Rep. 522, 6 S. W. 81; *Gregg* v. *Savage*, 51 Ill. App. 281; *Lawrence* v. *Bank*, 35 N. Y. 320; Shinn on Attachments, Section 467; Drake on Attachments, Section 453; Wade on Attachments, Section 355. In *Barter* v. *Spencer* (Okl.) 41 Pac. 605, and *Hulley* v. *Chedic* (Nev.) 36 Pac. 783, are collated a number of the leading cases upon this question.

Plaintiffs, in their brief filed by request of court since the submission of the appeal, advance the argument that the allegations of the complaint are sufficient for the matter now under consideration, because it avers that "under and by virtue of said writ of attachment, so issued as aforesaid the said sheriff attached all moneys, goods, effects, debts due or owing, and other personal property belonging, to the defendant B. Harris, in the possession of and under the control of the defendant Morris, by delivering to him a copy of said writ, with a notice in writing that such credits, property and debts were attached in pursuance of said writ." The legal significance of this language is that defendant Morris was served with garnishment; that and nothing more. It states that any moneys, goods, effects and debts in the possession of Morris, were attached by garnishment, but it fails utterly to allege that he had any such effects subject to garnishment at the time it was served. He who prays the interposition of equity in a case like this must show distinctly all the facts which entitle him to its aid.

Plaintiff's abandonment of all claim to the property which was claimed to have been sold to Sax & Zekind makes it unnecessary to consider the effect of the garnishment served, or attempted to be served, upon them.

Having reached the conclusion that a mere garnishment of the assignee did not create a lien upon the chattels in his possession, we shall next inquire whether such a lien is necessary in order to entitle plaintiffs to maintain the present suit. It is to be observed that this is not a bill for the discovery of equitable or other assets fraudulently secreted or concealed, and beyond the reach of execution. It must be remembered that there is no insolvency law in Montana, and that debtors may lawfully use their property for the payment of some creditors to the exclusion of others. This preference may be accomplished by mortgages securing some, without giving similar or any security to others; it may be accomplished by an actual delivery of a portion of the property in payment of some existing obligations, without similar provision for others; or it may be accomplished by a complete transfer of all the debtor's assets in trust to be converted into cash, and the proceeds applied towards the payment of his liabilities in the order provided in the instrument creating the trust. Unless done with fraudulent purpose, this may be lawfully done; even under circumstances indicating gross ingratitude to the unpreferred creditors, and the most inexcusable moral injustice in the distribution of the common fund from which all might reasonably expect to receive an equal pro rata payment. Whatever, therefore, may be the rights of creditors in other jurisdictions, in this state they have no right to interfere with or complain of their debtor's disposition of his property, so long as that disposition is untainted with the intent to hinder, delay or defraud them. If the debtor does make a disposition of his assets for the purpose of hindering, delaying, or defrauding his creditors, the act is void and of no effect as to them; and they may disregard the transfer, and pursue the same course in the enforcement of their claims as if such attempt had not been made. In many cases, however,—notably

and especially when the assets consist in whole or in part of real property,—it has been found that the attempted fraudulent disposition of assets by the debtor created a cloud upon the property sought to be reached, as well as upon the legal proceedings whereby the creditor was attempting to enforce his claim, and operated as an obstruction to the execution of the process through which the sale of the debtor's property was to be made. As such proceedings at law are taken in disregard of the alleged fraudulent and void transfer, but do not involve any adjudication of the invalidity of the transfer, purchasers at such sales have manifested a natural hesitancy in bidding for property supposed to be still involved in litigation; and hence these ordinary proceedings at law have frequently been considered inadequate for the attainment of the purposes rightfully sought to be accomplished through their agency. Courts of equity have, therefore, from very early times, entertained applications by creditors for the full relief which courts of law have been and are powerless to afford through the operation of their limited process. Such proceedings, then, involve no new encroachments by courts of equity upon the domain of law, nor do they call for the application of any new principles of equity jurisdiction. Inadequacy of the remedy afforded by courts of law constitutes the very cradle of chancery, and it might even more appropriately be called the parent of all power possessed by courts of equity; so that the recognition of the remediless rights of creditors is in harmony with the fundamental principles of proceedings in equity, and, if confined to cases necessarily requiring equitable aid, furnishes no ground for alarm even to the most ardent advocate of trial by jury. But while chancellors have ever lent a willing ear to the appeals of creditors, and have not evinced timidity in affording the requisite relief when warranted by the circumstances set forth in the bill, yet the extraordinary and peculiar powers of equity cannot be successfully invoked by those who have failed to first avail of whatever procedure the law affords for the establishment of their claims, and for the acquisition of a lien upon, interest in, or

right concerning some specific property.    For ordinary con-
tests in respect of disputed claims of creditors a court of
equity is not the proper forum.

One of the usual prerequisites to obtaining relief in equity
is the definite ascertainment, by judicial action, that the credi-
tor is entitled to the claim which he asserts against the debtor.
When the claim has reached the condition of an adjudicated
and determined demand, and assumed the form of a judgment
against the debtor, the creditor cannot even then always find
relief in equity.    Usually he will be required to prove that
his judgment cannot be enforced and satisfied by the processes
of the court that rendered it; and this proof is ordinarily,
though not always, made by the return of the sheriff on the
writ of execution showing that he cannot find property of de-
fendant subject to execution, and that the judgment remains
unsatisfied.    If the creditor asserts by his complaint that he
has a judgment, and proves by the return of the execution un-
satisfied, or alleges and proves, that the circumstances are
such as to make the issuance of an execution an idle ceremony,
he has thereby satisfied two of the chief requirements of
equity, and to that extent has laid the foundation for equi-
table interposition; and if the property sought to be reached
is real estate, and the judgment has been docketed so as to
impose the judgment as a lien upon that property, he will
usually obtain the aid he asks; but, if the property sought to
be reached is personalty, he must assert and disclose some
lien upon, some specific interest in, or some definite beneficial
right concerning the particular property.    An adjudicated
claim must first be shown by the creditor; he must next show
that he has pursued and exhausted his remedy at law, or that
under the circumstances he had none to exhaust; and he must
also show, in all cases like the one at bar, that he has some
lien upon specific property, or some specific and definite rights
in respect of it.    The doctrine governing this class of equi-
table remedies is well stated by Mr. Bump in Section 535 of
his Treatise on Fraudulent Conveyances.    His statement of
the rule is supported by the numerous authorities cited in the

note.   He says:   ''A fraudulent transfer is valid against all persons except those who proceed to appropriate the property by due course of law to the satisfaction of the grantor's debts.   As it is valid against a simple contract creditor, such creditor cannot ask the aid of a court of equity to set aside the transfer, for it does not interfere with his rights.   Equity has jurisdiction of fraud, but it does not collect debts.   A creditor must establish his demand at law, and obtain a lien upon the property, before the transfer interferes with his rights, or he has any title to claim relief in equity.   No creditor can be said to be delayed, hindered, or defrauded by any conveyance until some property out of which he has a specific right to be satisfied is withdrawn from his reach by a fraudulent conveyance.''

The relation sustained by the creditor to his debtor's personalty has been clearly explained in *Tolbert* v. *Horton*, (Minn.) 18 N. W. 648, where the Supreme Court of Minnesota had before it a case involving an attempt to avoid a chattel mortgage as fraudulent.   In the course of its opinion the court say:   ''As a creditor merely, without having availed himself of any legal remedy to apply the property to the satisfaction of the debt, the defendant could not interfere with or disturb the transfer of property affected by the plaintiff's mortgage.   The fact that the defendant was a creditor gave him no property in nor lien upon the goods of his debtor. Only by legal process could he, as a creditor, appropriate the property to himself, or subject it to be applied to the satisfaction of his demand.   Neither did the assumed conveyance of the property by the debtor, whether made for the purpose of security or of payment, place the defendant in a position to avail himself of the right, as a creditor, to assail the prior conveyance as being made in fraud of creditors, and thus to defeat the title of the prior mortgagee.   *   *   *   The object and effect of statutes avoiding fraudulent conveyances of property as to creditors is not to transfer any right of property, nor to dispense with legal remedies for the satisfaction of debts, but to remove obstacles fraudulently interposed to the

enforcing of such remedies, and to enable the creditor to avail himself of these remedies notwithstanding the fraud.''

The doctrine requiring the creditor to exhaust his legal remedies, and also to secure some special interest in or lien upon the debtor's property, is so well and universally sustained that authorities would seem unnecessary in its support. More than 30 years ago the Supreme Court of the United States, in *Jones* v. *Green,* 1 Wall. 330, announced this doctrine as familiar and established. The court, through Mr. Justice Field, say: ''The objection that the complainants have not shown any attempt to enforce their remedy at law is fatal to the relief prayed. A court of equity exercises its jurisdiction in favor of a judgment creditor, only when the remedy afforded him at law is ineffectual to reach the property of the debtor, or the enforcement of the legal remedy is obstructed by some incumbrance upon the debtor's property, or some fraudulent transfer of it. * * * In the second case the equitable relief sought rests upon the fact that the execution had issued, and a specific lien had been acquired upon the property of the debtor by its levy, but that the obstruction interposed prevents a sale of the property at a fair valuation. It is to remove the obstruction, and thus enable the creditor to obtain a full price for the property, that the suit is brought.''

The sheriff's return in each of plaintiff's actions shows that the judgment is wholly unsatisfied; but, while the authorities seem to sustain the conclusive nature of this return, plaintiffs themselves allege that the debtor had an abundance of assets subject to execution at the time they commenced their actions, and when the present suit was begun, and that they failed to resort to the process provided by law for securing that property, and placing it in the custody of the sheriff, where it would have been subject to execution for the satisfaction of their judgments. It does not appear from the complaint that the debtor's property consisted of assets beyond the reach of the writ, but, for aught is shown, it did consist of tangible property which could have been manually seized and held un

der the writ.    If this had been done, and plaintiffs could then
have shown that, notwithstanding such proceedings, execution
would not afford full relief, and secure a fair price for the
property seized, a different case would have been presented
for our consideration.    "The claim for relief rests upon the
fact that the crditor has acquired a specific lien upon the prop-
erty, and that the obstruction interposed prevents a sale at a
fair valuation.    The bill is filed to remove the obstruction, in
order that the creditor may obtain a full price for the prop-
erty.    He must therefore proceed at law until he obtains such
a lien.    (Bump on Fraudulent Conveyance, Sec. 547.)    This
court held in *Mer. Nat'l Bank* v. *Greenhood, supra,* that a
creditor who had obtained a lien by attachment, and who had
established his claim by judgment, furnished satisfactory evi-
dence that his remedy at law was exhausted when he showed
the issuance of execution, and its return to the effect that no
property could be found except that which had been already
attached.    In the later case of *Ryan* v. *Speith,* 18 Mont. 45,
44 Pac. 403, this court held that, whenever a creditor has a
trust in his favor, the issuing of an execution, and its return
showing the judgment to be unsatisfied, are not necessary pre-
requisites to equitable interference for the purpose of uncov-
ering, reaching, and having applied to his judgment, property
fraudulently disposed of and concealed, concerning which the
trust exists; and in the more recent case of *Montana National
Bank* v. *Merchants' National Bank, supra,* this court refused
to follow the rule adhered to in some jurisdictions, that a lien
by attachment does not satisfy the requirements of equity.
But in none of these cases has this court departed from the
familiar principle of equity jurisdiction to which we have re-
ferred.    In the Greenhood case there was an attachment lien
resultant upon an actual seizure, and, when the defendant
claimed that the attachment lien had been waived or aban-
doned, the court, in recognition of the importance of that lien,
reviewed the question with great care and at length, in order
to justify its holding that the lien had not been waived.    In
the Speith case the court, in acknowledgment of this principle,

quoted with approval the following language of the Supreme Court of the United States in *Case* v. *Beauregard*, 101 U. S. 688: "It has been decided that where it appears by the bill that the debtor is insolvent, and that the issuing of an execution would be of no practical utility, the issue of an execution is not a necessary prerequisite to equitable interference. * * * This is certainly true where the creditor has a lien or a trust in his favor. * * * But, without pursuing this subject further, it may be said that whenever a creditor has a trust in his favor, or a lien upon property for the debt due him, he may go into equity without exhausting legal process or remedies." *Case* v. *Beauregard* was also referred to and relied upon in the Greenhood case. Careful examination will disclose that all of the authorities cited and relied upon by the court in the Greenhood case expressly recognize the principles here announced. In *Tappan* v. *Evans*, 11 N. H. 327, it is said: "The general principle deducible from the authorities applicable to this case is that where property is subject to execution, and a creditor seeks to have a fraudulent conveyance or obstruction to a levy or sale removed, he may file a bill as soon as he has obtained a specific lien upon the property, whether the lien be obtained by attachment, judgment or the issuing of execution." In *Chicago & Alton Bridge Co.* v. *Anglo-American Packing & Provision Co.*, 46 Fed. 588, the court say: "In this case the claim was not only certain, but had back of it a judgment conclusive and binding; and, under the law of the forum where the attachment suit was instituted, the complainant had secured and fixed his lien upon the real estate. In *Robert* v. *Hodges*, 16 N. J. Eq. 304, the court say: "But all the cases proceed upon the principle that the judgment creditor, in order to be entitled to the aid of a court of equity in enforcing his remedy by removing obstructions from his path, must have acquired title to or a lien upon the specific thing against which he seeks to enforce his judgment. * * * Unless he has established his title to or lien upon the property of his debtor, he has no right to interfere with his debtor's disposition of it." Even in *Benham* v. *Ham*, 5

Wash. 128, 31 Pac. 459, the court say:  "We feel justified in now deciding that where a lien has been obtained by attachment on the property in controversy, and it appears upon the bill that the debtor is insolvent, and the issuance of an execution would be of no practical utility, the obtaining of a judgment, and the issuance of an execution thereon, is not a necessary prerequisite to equitable interference."   After quoting these and other cases as authorities in support of its position, this court said at page 447, 16 Mont., and page 266, 41 Pac., as the result of its comprehensive review, "We are perfectly satisfied that, under modern views of equity jurisprudence, the action will lie to remove a fraudulent obstruction to the reasonable success of plaintiff in realizing upon its attachment lien when it has reduced its claim to judgment, and it appears that the said obstacle to the fairly successful execution of judgment exists."

In their brief filed by request of court, plaintiffs suggest that this suit was authorized under, or as the result of, an order made in proceedings supplemental to execution, and that this fact furnishes a complete answer to all objections as to the sufficiency of the complaint.   Following is so much of Section 356, Code of Civil Procedure (Compiled Statutes of 1887), as is pertinent:   "If it appear that a person or corporation alleged to have property of the judgment debtor, or indebted to him, claims an interest in the property adverse to him, or denies the debt, the court or judge may authorize, by an order made to that effect, the judgment creditor to institute an action against such person or corporation for the recovery of such interest or debt; and the court or judge may, by order, forbid a transfer or other disposition of such interest or debt, until an action can be commenced and prosecuted to judgment."   The allegations of the complaint are to the effect that, after the return of the execution in *Wilson Bros.* v. *B. Harris*, proof was made to the court that the defendant Morris had in his possession property of Bathsheba Harris in an amount exceeding $50, and that after an examination of Morris an order

was made authorizing the plaintiffs last named to institute a suit against Morris for the recovery of such interest in the property claimed by him.    Section 356 is not intended to dispense with the usual and proper prerequisites to the exercise by courts of equity of their extraordinary powers to grant relief in creditors' suits.    Proceedings supplemental to execution are provided for in most, if not all, of the states.    The courts have not infrequently spoken of such proceedings as a substitute for the creditors' bill, and some have gone to the length of asserting that the creditors' suit in equity has thereby been abolished.    By the greater number of courts, and in the majority of cases, however, this extreme view has not been adopted in its entirety, but is modified to the extent of holding that the supplemental proceedings are designed to provide the only remedy, except in matters where the relief sought is beyond the scope of such proceedings, and that in those cases courts of equity yet retain jurisdiction to entertain the suit by creditors' bill.    Express sanction of the latter doctrine is found in *Ryan* v. *Maxey*, 14 Mont. 81, 35 Pac. 515. To say that such proceedings are a substitute for the creditors' bill is misleading as well as incorrect.    According to the practice in equity, creditors' bills lay (a) for discovery of assets, (b) to reach property or interests not liable to execution, and (c) to remove fraudulent obstructions standing in the way of execution.    The bill might have been maintained for discovery with or without either or both kinds of relief.    The bill was often dual in character, being both for discovery and for relief.    A reasonable degree of accuracy is attained when we say that the supplemental proceedings have, to a great extent, obviated the necessity of that feature of a creditors' bill which sought a discovery, but that, in so far as the equity suit was and is a bill for relief, the supplemental proceedings cannot be considered as a substitute for it, or as having more than a slight resemblance to it.    Careful reading of the statutes of the states which provide for supplemental proceedings leads to the conclusion that the main purpose of such legislation is the discovery of concealed property of the debtor, and that when

the chief design of the statute has been accomplished the relief prescribed differs from, and is not even analogous to, that afforded in equity, and that, where any relief whatever results from those proceedings, it is nearly akin to that afforded at law. In Indiana, however, the statutory proceedings are deemed a complete substitute for the creditors' bill as known to chancery.

Under the statutes of this state the judgment creditor may institute proceedings against the debtor himself whenever the execution has been returned unsatisfied, and this without proof, by affidavit or otherwise, as to the condition of the debtor's property; or he may proceed against the debtor at once after the issuance, and before the return of, the execution, provided only that he satisfy the court or judge that the debtor has property which he unjustly refuses to apply towards the satisfaction of the judgment. If the creditor succeeds in satisfying the court that any person other than the debtor has property belonging to him in an amount exceeding $50, those proceedings may be resorted to after execution issued, irrespective of whether it has been returned. When those proceedings are availed of under any one of the three conditions, there results a judicial inquiry into the financial circumstances of the judgment debtor; the principal, if not the only, purpose being to obtain from the debtor and other witnesses all possible information touching assets theretofore unknown, which ought to be applied towards satisfaction of judgment. Such investigation resulting in the discovery of property of the debtor, or of any sum due to him, the ownership or debt being indisputable, the court "may order any property of the judgment debtor not exempt from execution, in the hands of such debtor or any other person, or debt due to the debtor, to be applied towards the satisfaction of the judgment." When the proceedings result in such discovery and in such order they have manifestly operated merely in aid of execution, and have produced only the same result which the execution could have produced if the property so discovered had become known through any other method of inquiry. When resulting in the

accomplishment of their main design, those proceedings, it would seem clear, operate more nearly as a substitute for an execution than for any suit in equity.  If, however, the proceedings do not result in the discovery of assets indisputably belonging to the debtor, but result only in the ascertainment of contested claims of indebtedness or other property, the ownership of which is in dispute, the court or judge is powerless, under the law, to afford any relief whatever; for there is practical unanimity in the holding that the court has no jurisdiction to decide the dispute or to direct°the application of the property, and that the only power, under such facts, is found in the provision that the ''court or judge may authorize, by an order made to that effect, the judgment creditor to institute an action against such person or corporation for the recovery of such interest or debt; and the court or judge may, by order, forbid a transfer or 'other disposition of such interest or debt, until an action can be commenced and prosecuted to judgment.''

Supplemental proceedings may therefore result in the discovery of assets which, if known, would have been subject to execution, and in their application to the judgment through an order of the court suited to the purpose desired; or they may result in the discovery of supposed assets, the ownership of which is disputed, and therefore not within the power of the court to reach in such proceedings, the title to which can be determined only by an appropriate action thereafter brought. It is clear, therefore, that in respect of chattels capable of manual delivery the only relief afforded the creditor by the proceedings is that which follows from the order directing the application to the judgment of property which, as soon as delivered, could without the order be seized under execution. The only other order of the court which can be fairly deemed to be in the nature of relief is that prohibiting the transfer of property in dispute; for we do not regard the order which the court may make, authorizing the institution of an action to recover the interest, as giving any real relief, unless the judgment creditor could not maintain such an action without such

order. What, then, in the case before us, is the nature of, and the consequences flowing from, the order made in proceedings supplemental to the execution, authorizing the judgment creditor to ''institute an action for the recovery of such interest?'' Is such an order, even in a limited sense, in the nature of a judgment? Does it adjudicate any right or determine any controversy touching the ownership of property sought to be recovered by the action authorized? Does it affect the legal condition of such property, or charge with a lien ''personal property capable of manual delivery?'' Is the order so potent that any suit may be maintained and any form of action used by the creditor in respect of the property? These, and similar inquiries which might be suggested, carry their own answer, and seem to demonstrate the uselessness of the order in a case like the one at bar, where the assignor, an execution debtor, could not maintain an action against the assignee to recover property transferred to him by an instrument valid between the parties to it. Possibly (though we do not so intimate) the order in such case may serve as a basis for restraining a disposition of the property until an action can be commenced and prosecuted to judgment. This is the utmost effect that can be reasonably claimed for it under the allegations of the complaint. Such an order would doubtless, in the proper case, confer upon the execution creditor the right (otherwise not his) to bring the appropriate action.

We are of the opinion that it was not necessary for plaintiffs to resort to supplemental proceedings. While they properly sought whatever advantage in the way of discovering assets that might result from recourse to such proceedings, we think the order relied upon was not a prerequisite to the institution and maintenance of an appropriate suit in equity. (2 Freeman on Executions, Section 394; *Ryan* v. *Maxey,* 14 Mont. 81, 35 Pac. 515; *Hulley* v. *Chedic* (Nev.) 36 Pac. 783.) Even had the order possessed any legal vitality, it could but authorize the plaintiffs to bring an action which would be appropriate for the purpose sought to be accomplished, and which would vary according to the assets discov-

ered and sought to be reached. When, therefore, the creditor is thus authorized, unnecessarily or otherwise, to institute the appropriate action to recover property discovered by the supplemental proceedings, the action which he thus institutes must be subject to all the rules of pleading which are applicable to a similar action brought by any other person. We cannot think that the order has the effect of protecting his complaint from assault for want of equity, and we are aware of no principle by which we are required to measure the pleading in such action by rules other than those which are of application to similar actions not preceded by such order. These views are not in conflict with anything decided in *Sweeney* v *Schlessinger*, 18 Mont. 326, 45 Pac. 213. In that case it was held that the order authorizing the creditor to bring an action to reach assets practically not vendible on execution, and also incapable of manual delivery, is no part of the cause of action, and is therefore not required to be alleged in the complaint; the reason given being that such order ''is simply a provision to keep certain actions within the control of the court.'' Whether or not the reason be good, the court evidently entertained the opinion that the effect of the order was merely to enable the execution creditor to bring the appropriate action for the purpose of subjecting the assets to the satisfaction of his judgment. No lien upon or trust concerning the property was imposed or raised by the proceedings in the case at bar, or by the order passed therein. It does not appear that the property was concealed, or that it was incapable of manual delivery. On the contrary, the inference is that the property attempted to be pursued was that sought to be attached by garnishment. When the property became known, or was discovered through the proceedings, the way was open to plaintiffs to subject it to an execution, and thereby obtain such lien as equity demands, in a case like the one at bar, as a condition precedent to the exercise of its jurisdiction. Inquiry as to the validity and effect of an order appointing a receiver is not pertinent, as none was passed. Whatever may be the effect (if any) of supplemental proceedings, and of the

·order therein made authorizing an action, upon assets beyond the reach of execution, and upon property incapable of manual delivery, we think they do not impose a lien upon chattels ·capable of such delivery, and open to the writ. The general principle is recognized by the Supreme Court of Iowa in. *Reardon* v. *Henry*, 47 N. W. 1022: ''Proceedings auxiliary to execution as provided in the statute are extraordinary, and ·are only to be resorted to when the ordinary processes of the law are not adequate. The purpose of that proceeding is rather for the discovery of property than for applying that which is already known. . When the property is known, or ·by proceedings auxiliary to execution is discovered, the judg-ment creditor does not need the further aid of this statute, ·but may subject the property to the payment of his judgment ·by the levy of an execution. It does not appear that there ·was any concealment of this property, nor any question as to its identity, but only a question of whether it belonged to this plaintiff or his wife. We see no reason why this judgment creditor might not have levied upon the property as the property of Thomas Reardon, without any order that it be turned over. True, he might thereby have incurred litigation with Mrs. Reardon, but no more so than by this proceeding.   *   *   *'' Section 356 seems to have been modeled somewhat upon the statute of New York treating of the same matter; but it is to be observed that the statute of New York differs greatly from ours, and the divergence serves to illustrate in some degree the inutility—at least, in so far as a lien on personal property capable of manual delivery is concerned—of the provision of section 356 for an order authorizing an action. In New York ''such interest or debt shall be recoverable only in an action against such person or corporation by the receiver ; but the judge may, by order, forbid a transfer or other disposition of such property or interest until a sufficient opportunity be given to the receiver to commence the action and to prosecute the same to judgment and execution;'' and the receiver in such cases shall be vested with the property and effects of the debtor as soon as the order appointing him is recorded.

We are therefore of the opinion that the complaint does not state facts sufficient to constitute a cause of action; but we think plaintiffs should be afforded opportunity to amend their pleading as they may be advised; and hence it seems necessary to consider the evidence, the findings, and the errors specified.

2. The contention of plaintiffs as to the facts and the findings have been accurately condensed by the following statement, which we quote from one of their briefs: "The findings of the court, briefly summarized, are as follows: That Ben E. Harris was the general agent of B. Harris, and that all of his acts and transactions and doings concerning her business were approved by her without question; that this agency did not cease at the date of the assignment, but continued as long as the business of B. Harris was conducted by him, and the final disposition of the stock of merchandise in Chicago in the fall of 1893; that the establishment of the alleged firm of Sax & Zekind was a device to cover up a portion of the assets of B. Harris; that the goods contained in the house known as the 'Famous Clothing Company' constituted a part of the assets of B. Harris; that B. Harris conducted business at the Famous Clothing Company's store from the time that said assignment was made until the month of March, 1893; that the remnant of goods, worth about $6,000, were then boxed up by B. Harris, and placed in Curtin's warehouse until the month of July, 1893, when they were removed to her store known as the 'Phoenix,' and afterwards taken with the rest of said stock contained in the Phoenix store to the City of Chicago; that B. Harris was the purchaser of the goods at the assignee's sale, and she opened up a business at No. 119 North Main street on the 26th of April, 1892, doing business in the name of H. L. Frank; that five or six boxes of merchandise were taken from the cellar of the store at No. 119 North Main street, shortly after the assignment, to the cellar of the residence of B. Harris, and fraudulently concealed there; that, shortly after the commencement of business by B. Harris under the name of the 'Cannon Ball,' these boxes of merchan-

dise were removed to the store, and constituted a part of the stock of goods of the defendant B. Harris at that point; that large amounts of merchandise belonging to the defendant B. Harris were stored in the warehouse of the Great Northern and Northern Pacific railroads in the city of Helena some time before the purchase of the stock of goods at the assignee's sale, but were, immediately upon the opening of the Cannon Ball, transferred to that store; that these goods either belonged to the original stock of merchandise owned by B. Harris at the date of the assignment, and were fraudulently withheld, or were purchased with money belonging to the business of B. Harris at the date of the assignment ; that the business conducted by B. Harris at the Cannon Ball and at the Famous, and afterwards at the Phœnix, was done with the stock of goods as hereinabove set forth, until the same was removed to Chicago and disposed of in the fall of 1893 ; that during all of this time B. Harris, through her agent, was in the actual possession of a portion of said goods belonging to her stock of merchandise owned by her at the date of the assignment.''

The most radical position taken by plaintiffs is involved in their vigorous attack upon the claim of indebtedness by Bathsheba Harris to Salina Sax, the alleged fictitious sale to Sax & Zekind, and the sale by the assignee to H. L. Frank. These are the salient features of the case, and the *bona fides* of these transactions may be selected as the pivotal points in this long and complicated controversy. The question as to the time when Ben E. Harris' agency ceased, and that as to the concealment of sundry boxes of merchandise, may seem of equal importance; but they will be found dependent, to a great extent, upon the solution of those primary problems upon which plaintiffs practically rest the case.

With respect to the sale by the assignee to H. L. Frank, the court found that ''B. Harris, through her agent and general manager, Ben E. Harris, was the purchaser of the goods at the assignee's sale, and she opened up business at the store at 119 Main street, under the name of the 'Cannon Ball,' on April 26, 1892, doing business in the name of H. L. Frank.''

We have repeatedly and exhaustively examined the record in the hope of discovering proof to sustain this finding.  Search for evidence of any character which tends to sustain the conclusion expressed in this finding has been vain.  In the opinion heretofore rendered in this case (19 Mont. 69, 47 Pac. 1101) the justices, while disagreeing as to some questions, referred to this finding in the language following:  "While the finding does not so state, it suggests a participation of H. L. Frank in some fraud in the sale by the assignee to him.  It is expressly found that the assignee acted in good faith, and we do not think that the facts, as presented to us, warrant any different conclusion as to Frank."  We entirely agree in these views.  It may be that Frank was merely the nominal purchaser, taking title in his name for the benefit of Ben E. Harris.  If this be so, there is no substantial evidence tending to prove that the purchase was made for Bathsheba Harris, or even with her knowledge.  The same disposition may be made of the finding that the claim of Annie Harris was fictitious, and inserted in the assignment for the purpose of defrauding creditors.  There is no evidence before this court which justifies the finding.  The burden of proving that a preference is fraudulent is upon the party so charging, and the mere fact that the relationship of parent and child exists between the assignor and the person holding the demand preferred is not a badge of fraud.  Business dealings between near kinsmen are to be treated as are the transactions of other people, and, if the good faith thereof be assailed, fraud must be proved. (*Shultz* v. *Hoagland*, 85 N. Y. 464; *Curry* v. *Lloyd*, 22 Fed. 258; *Estes* v. *Gunter*, 122 U. S. 456, 7 Sup. Ct. 1275; Bump. on Fraudulent Conveyance, Sec. 177.)

The objects of plaintiffs' most vigorous assaults have been the sale by the assignor to Sax & Zekind, and the alleged indebtedness by the assignor to Salina Sax, upon which that transaction was based.  Their strenuous efforts to discover and bring to light some supposed fraud in connection with that matter have led to many of the disputes concerning the admissibility of the evidence by which plaintiffs have endeavored

to sustain their theories. Critical examination and full deter-
mination of this one matter may serve to eliminate from the
case many of the seemingly perplexing questions presented by
the reiterated objections of defendants to the competency of
plaintiffs' proofs. The court found that "the establishment
of the alleged firm of Sax & Zekind was a device to cover up
a portion of the assets of B. Harris, and to hinder and delay
her creditors; the goods, wares and merchandise left at the
house No. Nineteen (19) on Main street, Helena, on or about
the 1st day of October, 1891, and known as the 'Famous
Clothing Company,' constituted a portion of the assets of B.
Harris, and that their inventorial value was $18,000, and they
were a portion of the assets of B. Harris at the date of the
assignment on the 14th day of December, 1891; that the same
were withheld from the assignee for the purpose of hindering,
delaying and defrauding the creditors of the said B. Harris;
that they were in the actual possession of the said B. Harris,
through her general agent and manager, Ben E. Harris, from
the time of this pretended sale of goods to Salina Sax, or Sax
& Zekind, to the time they were finally disposed of in the city
of Chicago." Ben E. Harris, a witness produced by plain-
tiffs, testified plainly and repeatedly that his sister, Salina Sax,
received certain funds as the proceeds of insurance policies
upon her husband's life; that out of these funds she sent to
him in 1889 and 1890 about $12,000 to be used in the busi-
ness of her mother in Helena, with the understanding that she
should receive for the use of the money $150 each month;
that subsequently a branch of the business was opened in Butte,
by reason of the funds furnished by her being available for
such purpose, and that $150 a month was thereafter paid to
her out of the receipts of the branch store so long as it con-
tinued in operation; that afterwards the firm of Sax & Zekind
was formed, and goods amounting to about $14,000 were sold
to that firm, of which sum about $12,000 were paid by the
discharge of the debt then owing by Bathsheba Harris to Salina
Sax, and the remainder, about $2,000, continued as a charge
against the purchasing firm. Every dollar of the alleged re-

mittances by Salina to the agent of Bathsheba was traced by plaintiffs' witness into the business of the assignor, and the indebtedness is abundantly established by competent evidence offered at the instance of plaintiffs themselves. Salina Sax herself testified by deposition, and her evidence corroborates that of Ben E. Harris. Ingenious and plausible argument is the only answer made to this uncontradicted evidence. Presumption of fraud and perjury is not created by the kinship of Bathsheba, Salina and Ben E., nor can we allow the zeal of counsel to overcome the force of the evidence. Actual payment by Salina Sax to Bathsheba Harris of about $12,000 was so clearly proved that counsel do not dispute it. They seek, however, by reasoning resting upon suspicion only, to show that the sums advanced were not loans, but constituted a portion of the assets of the business carried on by Bathsheba Harris. There is neither allegation nor proof that Salina was a partner of her mother; that she had any interest in the business, or control over it; or that she sustained any relation whatever to the enterprise, except that of a creditor; yet we are seriously urged to confirm the finding that the delivery of the goods to Salina Sax by her mother in settlement of a debt resulting from advances admitted to have been made constitutes a mere fraudulent device for concealing assets of the mother. Moreover, during the trial, counsel for plaintiffs said: "I desire to state that, so far as the money that was given by Mrs. Sax is concerned, we do not controvert the fact that it went into the business of B. Harris, and that certain amounts were paid off from the bank in New York." Counsel for defendants then asked: "You don't deny the amount she turned over?" Plaintiffs' counsel responded: "No; it is something like $11,000."

Devotion by an insolvent debtor of all his estate to the payment of certain creditors naturally engenders disappointment in creditors unsecured, and, where one or more relations of the debtor are found in the list of preferred creditors, there is often added to the feeling of disappointment the conclusion that the preference is fraudulent and void; but it is hardly

necessary to say that such a feature of an assignment is as valid, in contemplation of law, as the most meritorious provision for any other class of creditors, and that, while courts will always examine with unusual care and watchful scrutiny the proof by which the good faith of the relatives is sought to be established whenever substantial evidence has been adduced showing fraud, yet it is the duty of courts to exclude from consideration all mere suspicion, and to confine investigation to the evidence exhibited in the record. Suspicion only is insufficient to establish the existence of fraud, which must be clearly and satisfactorily proved. Mere conjecture and surmise, however probable or persuasive, are never permitted to establish fraud. (Wait on Fraudulent Conveyance, Secs. 281, 283; Bump on Fraudulent Conveyance, Sec. 342.) We are forced to conclude, therefore, that at the time the firm of Sax & Zekind was formed the assignor was indebted to her daughter as averred by defendants.

While acting as agent for his mother, and in the course of business, Ben E. Harris made sundry representations to creditors, and reports to commercial agencies, concerning assets and liabilities. One of the issues raised by the pleadings was whether or not the assignor delivered to the assignee all her nonexempt property. Such representations and reports concerning the assets were sufficiently near in point of time to the assignment to be admissible as tending in some—though perhaps very slight—degree to shed light upon the amount of property owned by her when the assignment was executed, since there was evidence having a tendency to show a discrepancy between the assets as declared in one or more of the reports, and the property received by the assignee; but, standing alone, such evidence would certainly be insufficient to prove retention of property by the assignor. It is claimed that the representations and reports so made by Ben E. Harris have a bearing also upon the inquiry whether the assignor was indebted to Salina Sax; and the doctrine announced in *Shauer* v. *Alterton*, 151 U. S. 607, 14 Sup. Ct. 442, is invoked. We do not think the contention is sound. Seven witnesses testi-

fied as to such representations and reports. Armstrong, who was credit man of one of the plaintiffs, exhibited a memorandum made by him in August, 1891, as the substance of an oral statement made by Ben E. Harris as to the general condition of the business. That memorandum is as follows: "Her son, who does business in her name, says will discontinue stores in ·Butte and Great Falls, and concentrate at Helena. Have in business $50,000, including $11,000 belonging to sister." Knowles, manager for R. G. Dun & Co. at Helena, testified that in a report made in 1891 Ben E. Harris included among his liabilities the following item: "Liability on stock in Butte City, $12,501.27,"—and that Harris "further stated that this liability at Butte, above referred to, was owing to his sister." Gaines, another manager for Dun & Co., testified that he had two interviews with Harris—one in February, 1889, and the other in February, 1890,—and that no specific mention was made of liability to Salina Sax; but the proof is that the payments by her had not been made in February, 1889, and that her remittances extended from November, 1889, to May, 1890. When recalled this witness admitted that, after his interview in 1890, Knowles, as local manager, reported the interview of 1891, in which Harris had expressly stated a liability of over $12,000 on the stock at Butte, owing to his sister; and Gaines produced, as part of his testimony, the 1891 report to Knowles, which was the latest received by Dun & Co. from Harris. Berry, clerk in the credit department of one of the plaintiffs, testified that Harris stated to him in August, 1891, that "he could not tell the liabilities definitely, but thought they were in the neighborhood of $39,-500." Witness Eddy testified to a report made by Harris in 1887, some two years before Salina Sax made any loan or advanced money to her mother. Rosenburg and Gunther testified, respectively, to reports made March 18 and July 7, 1891, in which he made no specific mention of indebtedness to Salina Sax, but merely included in the list of liabilities the amounts due to the banks, bills payable, and open accounts. Rosenburg was credit man of one of plaintiffs, and he testified that

Harris made statements to him from which he made memoranda, and carried these into his credit records; but he says that Harris avowedly based his statements on his inventory of February 20, 1891. Gunther, local manager for the Bradstreet agency, also says that, in the report made to him, Harris stated that the figures he was furnishing were taken from that inventory; and as his report to Knowles, manager of Dun & Co., was made in February, 1891, and contained the express statement, as afterwards confirmed by extracts from the records of the company produced by Gaines, that among the liabilities was a debt to his sister of $12,000 and over, and that six months thereafter, and later in the year than his report to either Rosenburg or Gunther, he stated to witness Armstrong that his mother had in business about $50,000, "including $11,000 belonging to his sister," we cannot regard the general memoranda of the two witnesses, made from oral statements by Harris professedly based upon his inventories of an earlier date, the details of which had been frankly reported to other witnesses, as tending to prove concealment by Harris, or that there was in fact no such indebtedness. Plaintiffs having clearly established the indebtedness by the mother to the daughter, we must treat the business relation so created precisely as if it existed between strangers.

Being thus led to the unavoidable conclusion that, when the firm of Sax & Zekind was organized, Bathsheba Harris was under a *bona fide* financial obligation to Salina Sax to the extent of about $12,000, we are brought to the consideration of the Sax & Zekind transaction, of which plaintiffs complain, free from the suspicion with with which counsel seem to look upon it. If in October, 1891, when the alleged sale to Sax & Zekind was made, Bathsheba Harris had actually paid or discharged that obligation in any way other than by the sale shown in this record, the suggestion would hardly be made that her right to make such settlement could be questioned; and we think that the views of counsel for plaintiffs upon this subject rest almost entirely upon their belief that no such debt in fact existed; for when the obligation is once conceded, or

shown to exist, the satisfaction of that obligation by the sale of merchandise is as free from any badge of fraud as a payment in money, or any other form of liquidation or settlement; and, as we have been unable to find in the record any substantial evidence tending to sustain the views of the trial court as to the nonexistence of the indebtedness, we are necessarily unable to share with counsel their presumptions touching the character of the alleged sale to Sax & Zekind. That the partnership was actually formed, and that Ben E. Harris, acting as agent for his mother, sold and delivered merchandise to the firm, no witness has questioned; and we cannot, without traveling without the record, and indulging in suspicions which ought to find no place in judicial action, justify the court below in finding that the settlement between Bathsheba Harris and Salina Sax was a fraudulent device to conceal assets belonging to the former. Much stress has been laid upon the fact that Ben E. Harris acted as agent for his sister, as well as for his mother, in arranging the details of settlement through the sale, and the fact that Harris acted for his sister in the conduct of the business of Sax & Zekind after the sale by the mother to them is given emphasis; but the right of these women to employ their relative to act for them with respect to the transaction cannot be seriously questioned, and we are satisfied that these circumstances should not, under all the evidence adduced, be treated as tending in any substantial way to prove the fraudulent or fictitious character of the sale. Plaintiffs did, however, introduce one witness (Neufeld, a commercial traveler,) for the purpose of showing that the sale was fictitious. He testified that he had a conversation with Ben E Harris, in Helena, in the latter part of November, or beginning of December, 1891. The talk took place on the street, and Harris "pointed to a store about a block further down the street than his mother's, as we were passing it, and said that place belonged to his mother, also; that they had sold it some time before to the party in possession, but he had not paid for it; consequently the store was still theirs." This declaration was received, not for the purpose of impeachment

of a witness, but as tending to show an admission made by Bathsheba Harris through her agent; but it was beyond the scope of the authority of Ben. E. Harris to make the admission on behalf of his principal. It was not relevant to any transaction of hers then pending, nor did it refer to property in the agent's possession, and can have no effect upon the right of either the vendor or the vendee, whose sale and purchase he is quoted as having pronounced to be unreal.

From the evidence presented we conclude, therefore, that the amount for which Annie Harris was preferred in the assignment was a just debt; that the Bathsheba Harris indebtedness to Salina Sax was *bona fide*, and that the sale from the former to the latter, and the crediting upon the purchase price of the amount of the seller's debt, was a valid method of discharging the several obligations from one to the other, and that, therefore, the sale to Sax & Zekind was not a fraudulent device to conceal assets of the debtor, and that the subsequent sale by the assignee to Frank was a valid transfer of the assets then in his hands; and that there is no proof that the purchase was made in the name of Frank for Bathsheba Harris.

Having satisfied ourselves, after many weeks of patient investigation, as to these important features of the transactions involved in this action, little difficulty is found in determining that the testimony of plaintiffs' witness Ben E. Harris, to the effect that his agency for Bathsheba ceased on the day after the assignment, is uncontradicted either by direct or circumstantial proof. True, this testimony was elicited upon cross-examination, but the witness remained the witness of the plaintiffs, and the evidence was brought out on proper cross-examination. It was therefore part of their case in chief. (Rice on Evidence, Sec. 285; see, also, *Casey* v. *Thieviege*, 19 Mont. 341, 48 Pac. 394, and *Boe* v. *Lynch*, 20 Mont. 80, 49 Pac. 381.) Moreover, if this item of evidence be eliminated, the result would be the same; for an assignment by the principal, for the benefit of creditors, of the subject-matter of the agency, revokes the authority of the agent, unless that authority is coupled with an interest, upon the ground that the

assignment devests the principal of control and management of his property, and confides the same to the assignee, under whose control the subject-matter then passes. (Mechem on Agency, Secs. 263, 265; 1 Am. and Eng. Ency. Law, 1227; and see *Williston* v. *Camp*, 9 Mont. 88, 22 Pac. 501.) Hence it becomes unnecessary to enter upon an extended discussion of the many questions raised by the record as to the admissibility of declarations made by Ben E. Harris, or of the testimony of others touching matters occurring after the assignment; nor is it needful to consider the distinction drawn by some courts between evidence of admissions made by the assignor, or his agent, while in possession of and concerning property not delivered to the assignee, and evidence of admissions relating to property received by the assignee, unless it shall appear from a further examination of the record that some other property was retained by the assignor personally, or through her agent—otherwise these questions are impertinent.

One other feature of the case remains, upon which counsel for plaintiffs have relied,—the alleged retention and concealment of assets (other than those delivered to Sax & Zekind) by the assignor. They insist that this has been so thoroughly demonstrated that the judgment should be affirmed, even if the proof fails to sustain any of the other allegations of the complaint. The findings which cover this subject are as follows: "That five or six boxes of merchandise, weighing from two hundred and fifty to three hundred pounds each, were taken from the cellar of the store at No. 119 shortly before the assignment was made, on the 14th day of December, 1891, to the cellar of the residence of the said B. Harris, on Ewing street, Helena, Montana; that said goods belonged to the assets of said B. Harris, and were fraudulently concealed and not turned over to the assignee, for the purpose of defrauding the creditors; that, shortly after B. Harris commenced business under the name of the 'Cannon Ball,' said boxes of merchandise were removed from said cellar in the residence of B. Harris to the store on Main street, and there-

after constituted a portion of the stock of goods of the defendant B. Harris at that place; that a large amount of merchandise belonging to the defendant B. Harris was stored in the warehouses of the Great Northern and Northern Pacific Railways in the city of Helena some time before the purchase of the stock of goods at the assignee's sale as above set forth; that upon the purchase of said stock of goods said goods so warehoused were immediately transferred to the store at the Cannon Ball, and constituted a part of the stock of goods with which the defendant Harris was doing business at that point; that said goods so transferred from said depots either belonged to the original stock of merchandise owned by the defendant Harris at the date of the assignment, and fraudulently kept out of said assignment, or were purchased with money belonging to the business of said B. Harris at the date of said assignment and which should have been turned over to the assignee; that the defendant B. Harris, through her general agent and manager aforesaid, continued to conduct business at Nos. 119 and 19 Main street, and at the Phœnix, with the stock of goods constituted as hereinbefore set forth, until the same was removed to Chicago, and disposed of there, in the fall of 1893; that during all of the said time the defendant B. Harris, through her agent, was in the actual possession of a portion of said goods belonging to her stock of merchandise owned by her at the date of the assignment.'' These findings are based mainly upon the testimony of several clerks and teamsters, and of the freight agent of the Montana Central Railway Company. In so far as the evidence relates to dealings between the Famous Clothing Company, as conducted by Sax & Zekind, or by Salina Sax alone, and the Cannon Ball or Phœnix Clothing Company, as conducted by Frank through his agent, we deem it immaterial, as we have already held that the record contains no proof by which the presumption of good faith and validity of the sale to any of these persons has been rebutted; and we are therefore unable to appreciate the pertinency of proof as to subsequent business dealings between them. For like reasons we think that none of

the testimony in respect of shipments of goods to Great Falls, either by Frank or the Famous Clothing Company, is material or relevant. This disposes of the testimony of Cohen, Davis and Wallace, and leaves for consideration the evidence given by Morteson and Monroe. Morteson testified that he was in the employ of the assignor when the assignment was made, worked for the assignee afterwards, and remembered when the Cannon Ball was opened by Frank. Referring expressly to a date subsequent to the opening of the Cannon Ball, he stated: "One day several boxes came there. The first were marked 'S. S. Harris & Co.' They were put on the sidewalk on Jackson street, and then carried into the store. There was about a dozen of these boxes,—maybe less, maybe more. I guess there was clothing in the boxes, maybe some furnishing goods. I think B. E. Harris told me to turn the name on the boxes down on the sidewalk, and I did it. I don't know who ordered those goods marked 'S. S. Harris,' and I don't know where they came from. I don't know that they were ever entered on the books of H. L. Frank. These goods that came marked 'S. S. Harris' were unpacked, and I took them and put them on the shelves and tables with the rest of the goods. In November, 1891, there were other goods came into the store. There was some furniture, and crates of household furniture. I think they came from Great Falls. We took them downstairs, in the basement. They remained there some weeks, and were then shipped back to Great Falls. They were shipped to Hattie Harris, Great Falls. It was about five months after the assignment that the goods marked 'S. S. Harris,' or 'Mrs. Sarah S. Harris,' came to the store, and it was after H. L. Frank had taken charge. These goods came very close to the time they opened up as the Cannon Ball, but I don't know when they were ordered." Monroe testified that in 1891 and 1892 he was a teamster working for one Smith, who was in the "transfer business," that he recollected the time of the assignment, and that the house was reopened by Frank as the Cannon Ball. "I hauled on different

occasions a good many goods there, but on one occasion especially, I hauled goods there to the Cannon Ball Clothing House, and in one case there was some goods that I hauled there at the back of the store that Mr. Harris made me turn upside down. The boxes were marked 'B. Harris.' That was after the store was opened up under the name of the 'Cannon Ball.' It was in the spring of the year. I should judge there might have been a dozen such boxes. They were new boxes. Usually, when we hauled goods to that place, we generally turn the boxes right side up. The mark on top is customary, but this time he told me to turn them wrong side up, and I did so at his request. I got those boxes at the Montana Central depot. Again I hauled some boxes from that store to Ben Harris' house on Ewing street. If I recollect right we got them out of the cellar at 119 Main street. This was also after the store opened up as the Cannon Ball. There were five or six boxes, and I put them in the cellar at his house." He also stated that he hauled some boxes away from Harris' house, but said: "I can't remember whether we took them to the clothing store, or to the freight house of the Montana Central. I think it was after they opened up as the Cannon Ball that we hauled them away from the house. I think it was in the spring of the year. We hauled them away at the instance of old Captain Smith. I was working for him at that time." He stated that the boxes which he hauled to the cellar of the Harris house were common dry goods boxes, weighing from 250 to 300 pounds each, and that they were old boxes renailed. On cross-examination he said: "The time I hauled these boxes was after the store was opened as the Cannon Ball by H. L. Frank. I unloaded the boxes at the rear end of the store on Jackson street. I think this young man, Morteson, was there at the time. I think it was in 1892 that Ben Harris first opened up his store at 119 Main street. I think it was before the assignment. I can't say exactly what time of year it was. I think it was in the spring. I think the assignment was made in 1892. I don't know exactly. I don't know how long he had been at 119 before he made the

assignment.   He had been there as much as a month, and may have been there longer for all I know.   At the time I un-loaded these boxes there was nobody around but Ben Harris and myself.   I am quite certain the boxes were marked 'B. Harris.'   I don't think they were marked 'S. S. Harris and Company.'   I cannot fix the month of the year 1892 that this occurred.   I remember the Fourth of July.   I was pretty full of booze at that time.   This is not my usual condition.   I did not see the waybill or bill of lading for those goods, and I don't know what was done with the boxes after I unloaded them on the sidewalk on Jackson street.   I think it was in the spring of 1892, also, that I hauled the boxes from 119 to Ben Harris' house; but it was after I hauled the boxes from the depot, if I remember right.   I hauled the goods from the store to his house at Captain Smith's request.   I know Myer Har-ris.   I don't know whether he had anything to do with the hauling of these goods to Ben Harris' house or not.   Later I hauled those goods from the house down to the depot, or to the store.   They were marked 'Hattie Harris,' or 'Annie Harris.'   I would not be sure.   They may have been house-hold goods, for all that I know.   Mr. Ben Harris gave me directions as to how to get the boxes at the house.   I took the same number of boxes away from the house that I took up there—five or six boxes.   I don't know whether there were any barrels among them or not.   That is the only occasion that I ever took goods up to the store that Ben Harris told me to turn the boxes wrong side up.''   Sawyer, local freight agent of the Montana Central Railway Company, produced a waybill showing a shipment from Great Falls to Helena on October 31, 1891, from B. H. to B. H.   It showed that the shipment consisted of household goods only, and he testified that they arrived in Helena November 1st or 2d.   He pro-duced, also, a waybill, dated May 3, 1892, for a shipment of furniture from one Curtin, at Helena, to Mrs. Harris, at Great Falls, and identified four other bills of lading, each of which showed the arrival in Helena from Chicago in April, 1892, of boxes of clothing and furnishing goods.   He testified that the

bills showed that the goods were shipped from Chicago about April, 1892, and arrived at Helena about the 27th of April. Nine other waybills were received in evidence, showing shipments to S. S. Harris & Co., which arrived in Helena from Chicago during the same month.

The testimony of Morteson is in conflict with that of Monroe, that of Monroe is inconsistent with the admitted facts in the case, and plaintiffs deemed it necessary to correct Monroe's statements in order to adapt his testimony to their theory of the case, and to justify the findings; but both of the witnesses agree that all the transactions testified to by them occurred about five months after the making of the assignment, and some time during the spring of 1892. Learned counsel for plaintiffs assure us that "Monroe gets his dates mixed," but we are asked to substitute for these errors those dates which would sustain plaintiffs' views; and we are expected to read the rest of Monroe's testimony with a feeling of confidence that his ideas and recollections are not "mixed" as to anything except the dates, although the only portion of his testimony which is supported by Morteson (who was present at the time the hauling was done) is that relating to the date when these occurrences took place. Monroe said that he hauled about a dozen boxes to the Cannon Ball in the spring of 1892; that the boxes were marked "B. Harris," and not "S. S. Harris & Co.;" that Morteson was present, but that no one assisted him to unload them; and that at the request of Ben E. Harris he turned the boxes upside down. Morteson testified that the boxes were marked "S. S. Harris & Co.," and that he turned them upside down at the request of Harris. The freight agent of the railroad company testified that no shipments marked "B. Harris" were received at that time over the Montana Central Railway. It would seem safe, therefore, to conclude that Monroe is also confused as to the marks on the boxes, or that either he or Morteson is in error as to who hauled them, who unloaded them, and who turned them upside down; but, however this may be, there seems to be no controversy raised by the evidence as to the fact that

whoever hauled them, and whoever placed them on the sidewalk marks down, did so in the spring of 1892, long after the assignment, and did so at the request of Ben E. Harris, who was not then the agent of the assignor.

Monroe testified also that he hauled five or six boxes from the cellar of the Cannon Ball store to the cellar of Ben E. Harris' house, and that later he hauled them from the house either to the depot or back to the store; that these boxes were marked ''Hattie Harris,'' or ''Annie Harris;'' and that they may have contained household goods, though he was unaware of their contents. These five or six boxes which were removed from the cellar of the Cannon Ball were received in the spring of 1892, as plaintiffs' witnesses testified, or else they were received prior to the assignment, and were in the cellar of the house at the time when all its contents were delivered to the assignee, as found by the court; and as all the goods which were delivered to the assignee were subsequently sold by him, either at retail, or in bulk to Frank, and as Morteson testified that the twelve boxes were unpacked by him, and their contents placed upon the shelves and tables in the Cannon Ball, it would seem that these various boxes of merchandise, about which so much has been said, were the property of Frank, or at least that the twelve boxes were Frank's, and the five or six boxes were his, or else belonged to Annie or Hattie Harris. We are unable to see that any light is shed by either of these transactions upon the good faith of the previous assignment by Bathsheba Harris. We cannot conclude that an assignment made by her in December, 1891, was fraudulent and void because in the spring of 1892 sundry boxes of merchandise marked ''S. S. Harris & Co.,'' or even ''B. Harris,'' were received by H. L. Frank, and were directed by Frank's agent to be inverted on the sidewalk; nor would we be warranted in holding that the assignment was fraudulent even if the proof shows that Ben E. Harris, for himself, or while acting as agent of Frank, took five or six, or any other number, of boxes from the cellar or other part of Frank's stores and properly or improperly placed them in

his own house or elsewhere. The foundation of all plaintiffs' contentions as to this branch of the case is the assumption that the sales to Sax & Zekind and to Frank were fraudulent; and, as already stated, with this unsustained theory eliminated the other questions are of easy solution.

Having determined from the evidence that the agency of Ben E. Harris for Bathsheba Harris ceased with December 14, 1891, that the transfer to Sax & Zekind prior to that time was a *bona fide* sale, and that the sale to Frank was free from fraud affecting the assignment, we must hold that the evidence relating to the transfer, exchange or handling of goods to or from the business house of Frank, or that of Sax & Zekind or Salina Sax, was not pertinent to the issues, and that the acts, declarations or admissions of Ben E. Harris after December 14, 1891, were inadmissible for the purpose of showing fraud in the assignment made on that day. It may be that, at the assignee's sale to Frank, Ben E. Harris, or some other person, was the real purchaser; but the record is barren of evidence tending to prove that Bathsheba Harris knew of any act of her former agent, of Frank, or of the assignee, performed after the assignment. If Ben E. Harris concealed the addresses upon boxes of merchandise received in the spring of 1892 at the house conducted in the name of Frank, he did not, so far as the evidence shows, do so as the agent of Bathsheba Harris, and hence his reasons for so acting are not relevant on the question of the good faith of the assignment.

Counsel for plaintiffs devote much argument to the inferences of fraud which they ask be drawn from the situation and relation of the parties against whom fraud is alleged, and from certain acts done and declarations made by Ben E. Harris. Among these are the insolvency of Ben E. Harris; the advanced age of his mother; the fact that after the assignment he became agent for Frank, and continued to act as agent for Salina Sax; his seeming unwillingness as a witness, and evasion of questions. All the matters so persistently and earnestly pressed upon us by counsel have been considered and given due weight. Plaintiffs have been unable to present any

evidence which justifies the inferences deduced by them. Mere suspicions may be engendered, and speculations indulged, but these fall short of that distinct and clear proof of fraud necessary to the avoidance of a written contract attended with every presumption of validity.

The judgment and the order are reversed, and the cause is remanded, with directions to grant a new trial.

*Reversed and Remanded.*

PEMBERTON, C. J.    I concur in the conclusion reached by Mr. Justice Pigott except as to the legal effect of the proceedings supplemental to execution, referred to and treated in the opinion, upon which question I express no opinion.

HUNT, J. (dissenting)—When this case was first presented to the supreme court, in December, 1896, I took no part in the hearing or consideration of the same. This appears by the brief order filed by the court affirming the judgment, and participated in by the Chief Justice and Mr. Justice De Witt. *Wilson* v. *Harris*, 19 Mont. 69, 47 Pac. 1101. In the order of the court, however, this language was used: "The case was argued on December 7, 1896, before Mr. Chief Justice Pemberton and Mr. Justice De Witt; Mr. Justice Hunt deeming himself disqualified." The words which purported to state my position were inadvertantly used by the court. I never deemed myself disqualified, nor was I disqualified under any possible construction of the law. I am neither a party, nor am I directly or indirectly interested in this action or any proceeding had therein. I am in no way related to either party; I have never been attorney or counsel for either party; nor did I render or make the judgment, order or decision appealed from (see Section 180, Code of Civil Procedure 1895); nor have I any bias or prejudice of any kind whatever. In declining to sit at the first hearing I merely yielded to a personal disinclination to review a case which was the outgrowth of proceedings had in another suit, in which, as district

judge, I had made the order authorizing this appealed suit to be instituted. These are the facts: In 1892, plaintiffs, in actions upon debt, recovered judgments by default in the district court against defendant B. Harris. At that time I was a judge of the district court in and for Lewis and Clarke county, and rendered several, if not all, of such judgments. None of these judgments was appealed from. Thereafter, in due form, under Section 353, Code of Civil Procedure 1887, affidavit was filed and proof was made to the satisfaction of the district court, of which I was the judge, that Moses Morris (the original assignee of B. Harris) and Sax & Zekind had in their possession property of the defendants in a large amount. Said parties were then ordered to appear and answer as required by the statute. Brief hearing was had before me as judge, and under Section 356 of the Code of Civil Procedure of 1887, it having appeared that the persons alleged to have property of the judgment debtor claimed an interest in the property adverse to the judgment debtor, and denied the debt, as judge I made an order authorizing the judgment creditors to institute an action against said Morris and Sax & Zekind for the recovery of the interest claimed; and an injunction was issued forbidding the transfer or other disposition of the interest claimed, or debt, until an action could be commenced and prosecuted to judgment. Thereafter this present action, in the nature of a creditors' bill to set aside the assignment by B. Harris to Moses Harris, was instituted; and although it was pending in the district court before I retired as a judge thereof, and although I may have made some order in the initial stages of its progress, the questions raised on this appeal and the points considered by this court have never been presented to or considered by me. The cause was proceeded with, tried and determined by the Honorable H. R. Buck, sitting as a judge of the district court; and from a judgment rendered by him, and from his order overruling a motion for a new trial, this appeal is taken. On January 4, 1897, two days after the affirmance by this court of the judgment of the district court, Mr. Justice De Witt re-

tired as a member of the supreme court. His successor was the aforesaid Honorable H. R. Buck. Within the time allowed in which to move for a rehearing, and just after Mr. Justice Buck became a member of the supreme court, the appellants herein filed a motion for a reargument and a rehearing. Briefs were submitted, not alone upon the points of law relied upon, but upon the attitude of the case before the court under the peculiar situation that had arisen. Justice Buck, being disqualified, did not participate at all. Plainly, the parties were entitled to a decision of the motion, at least as to the competency of the court to which the motion was addressed. Confronted with so unusual a situation, my duty was to subordinate all personal disinclinations, and to act with the chief justice in first deciding whether there were two justices qualified to act. To this inquiry there could be but one answer: A majority of the court (the chief justice and I) were qualified. As my right to sit existed, it was my duty, of course, to act. After determining this point, we decided that, although the appellants had not brought themselves strictly within the rules governing rehearings by this court, nevertheless, under the circumstances, it seemed just and proper that the case should be orally reargued before the court consisting of the chief justice and myself. This was agreeable to all counsel, and the case was thereafter argued to a majority court, Justice Buck not sitting. Before a decision was reached, however, Mr. Justice Buck died, and Mr. Justice Pigott became a member of the court. The importance of the case warranted the court, of its own motion, to unanimously order a resubmission of it to the entire bench. This was agreeable to all counsel. It would have been more agreeable to me to have again refrained from sitting, but I felt it a duty to take part in the hearing. It was accordingly reargued by counsel to the full court, and again taken under advisement. Since its submission our earnest attention has again been given it, in a conscientious effort to reach a correct result; and, while it is impossible for the court to unanimously agree upon the law, I feel it is to the interest of all parties concerned that a conclusion has finally been arrived at.

1.   I disagree with the majority of the court in their interpretation of the attachment statutes in force prior to the adoption of the codes.

My reasons for dissenting are these:   By the fifth subdivision of section 186 of the Code of Civil Procedure of 1887, the method of attaching personal property of the defendant which is capable of manual delivery is by taking it into custody; while the method of attaching personal property belonging to the defendant, and not capable of manual delivery, and not in defendant's actual possession, is by leaving with the person having possession or control of such property a copy of the writ and a notice of attachment.   The operation of this statute may be exemplified by an instance of an attachment of a horse in the possession of the defendant, and an attachment of a growing crop belonging to the defendant, but in the control and possession of a servant or agent of the defendant. To attach the horse, the sheriff must take it from the possession of the defendant, and into his own custody—it is capable of manual delivery; while, to attach the growing crop, which is incapable of manual delivery, he need only serve the copy of the writ and notice provided for by section 186.   The object of this fifth subdivision is principally to extend the remedy of attachment to property belonging to defendant, yet not capable of manual delivery.   The statute thus enables the creditor to gain a lien on all of the personal property of a defendant, whether capable or incapable of manual delivery, and whether in or out of defendant's actual possession or control.

I do not doubt the right, under the statute cited, to seize the property of a defendant in the possession or control of a third person by taking it into actual custody; and, if there were no other statutes upon the subject besides those above referred to, the remedy would doubtless be confined to an actual taking, if capable of manual delivery.   The Utah decision (*Kiesel* v. *U. P. Railway Co.*, 21 Pac. 499) cited by Justice Pigott would then be entitled to much consideration. But, in my judgment, no construction of the attachment laws

is correct which fails to give full effect to section 188, and other following sections of the Compiled Statutes. I think that section 188, overlooked apparently by the Utah decision, was designed to provide another mode of attaching personal property belonging to a defendant, in the possession or under the control of any person other than the defendant himself. The mode prescribed is by serving upon the person in possession, or having control of, the property, a copy of the writ, and a notice that the property is attached in pursuance of such writ. The service of the copy and notice constitutes the attachment, and not merely a procedure in aid of an attachment. My learned associates admit that, by section 186 and its provisions, such a service constitutes an attachment if the property is not capable of manual delivery, but deny that it so operates if the property is capable of such delivery. But if they are right, as they clearly are, in the view that the mere service of the copy and notice is an attachment where the property is not capable of manual delivery, it is difficult to see why a like service made under section 188 is not equally effective as an attachment of any personal property, whether capable or not of manual delivery, of the defendant in the hands of a third person. I cannot assent to any limitation of the words of section 188 by which the meaning of the section is interpreted to confine an attachment to property not capable of manual delivery. Its provisions are, in effect, that if any person has in his possession or under his control "any credits or other personal property belonging to the defendant," etc., "the sheriff shall serve a notice that such credits or other property  *  *  *  are attached in pursuance of such writ." The essence of the section is to enable plaintiff to acquire a lien by the service of a copy of the writ of attachment and the notice indorsed thereon. No qualification of the words "other personal property" appears, as in the New York statute, for instance. (Voorhees' Code, Sec. 235.) They apply as well to one class of personal property as to another, and I cannot import into the statute restrictions which confine its applicability only to property not capable of

manual delivery. Confirmation of this interpretation is found in section 190, wherein it is provided that any person having in his possession personal property belonging to the defendant may be brought before the court, and examined on oath respecting the same. The court may then order personal property capable of manual delivery to be delivered to the sheriff upon such terms as may be just, having due regard to any liens thereon. If the only method of attaching personal property of a defendant which is capable of manual delivery is by actual seizure, the court, if it can acquire any jurisdiction at all to order its delivery, must order it delivered to the sheriff. But I think that there is no such mandatory provision. The court may order it turned over, but is not obliged to do so. The statute recognizes, by implication, the fact that the property can as well be left in the possession of a third person, and yet be subject to the attachment as effectively as if delivered over to the sheriff. Section 189 likewise contemplates that property attached pursuant to the provisions of section 188 need not pass into the hands of the sheriff, although capable of manual delivery; for it provides that one having possession of personal property belonging to the defendant, and served with the copy of the writ and notice required, shall be liable to the plaintiff for the amount of the property until the attachment is discharged, or any judgment is recovered, unless such property be delivered up or transferred. If the only method of acquiring a lien of attachment upon personal property of the defendant in the hands of a third person, capable of manual delivery, is by taking it into actual custody, this statute inconsistently authorizes such third person possessing such property to yet remain in possession of the same, and simultaneously become liable for property never taken into custody at all, and therefore, according to the majority opinion, never attached at all; for section 189 is based upon the fact being undisputed that there is property in the hands of such third person, and that he has been served with the copy of the writ, but has never parted with the possession of the personal property so held by him, and does not intend to part

with it.    The many difficulties of proceeding in execution after judgment are no greater in a case where personal property in a third person's possession is attached, than where a debt or credit is.    Courts of equity can solve such questions with due reference to liens and claims of others.

*Johnson* v. *Gorham*, 6 Cal. 196, cited by the majority opinion, sustains the conclusion reached by my associates; but the court gave no reasons for its decision, cited no books, and did not attempt to analyze the various statutes of the state of California.

The doctrine of *Biglow* v. *Andress*, 31 Ill. 323, also cited, is certainly not followed in the case of *Smith* v. *The Clinton Bridge Co.*, 13 Bradwell App. Court Reports 572, where the court said:    "Where a writ of garnishment is served upon a debtor, it must create a qualified lien, or have the effect of a qualified appropriation of the indebtedness by the law to the objects and purpose of the attachment, that is binding alike upon the defendant, the garnishee and third parties; otherwise the garnishment might always be rendered wholly nugatory and futile by payment or assignment of the debt."

In *Northfield Knife Co.* v. *Shapleigh*, 24 Neb. 635, 39 N. W. 788, the court said:    " We are aware that in *Bigelow* v. *Andress*, 31 Ill. 322, it was held that garnishment imposed no lien upon the goods in the garnishee's hands, and did not put them in *custodia legis*.    If this was the rule, proceedings by garnishment would be an expensive farce, which would give the attaching creditor no rights under the attachment. Neither can the right be restricted to the personal liability of the garnishee, as he might be insolvent, or unable to pay the value of the property.    We hold, therefore, that garnishment is an attachment of the goods in the hands of the garnishee, and that such goods are not subject to levy and sale upon process thereafter levied during the continuance of said attachment."    (See, also, *Reed* v. *Fletcher* (Neb.) 39 N. W. 437.)

It is true that the Nebraska decisions were where the property was mortgaged by chattel mortgage, but the doctrine of

the cases is that the garnishment proceedings imposed a lien upon the effects in the garnishee's hands.

The case of *Focke, Wilkins, Lange et al.* v. *Leon and Blum* (decided in 1891 by the Supreme Court of Texas) 82 Tex. 436, 17 S. W. 770, in its facts, is very like the case at bar. An assignment for the benefit of creditors was made. Actions were brought wherein the person who held possession of the stock of goods was served with writs of garnishment. Subsequently other creditors by attachment seized the goods, and took them from the possession of the garnishee. It was decided that, although the garnishee was not a debtor owing a sum of money, but had in his possession effects subject to execution and to the satisfaction of plaintiffs' claim belonging to the debtor firm at the time of the service of the writ of garnishment upon him, the service or levy of the writ of garnishment, which was virtually a process of attachment, had the effect of placing the property of the debtor in the hands of the garnishee at the time in *custodia legis*, and of creating at least a right *ad rem* or *quasi* lien upon the effects or property, in favor of the plaintiffs in the writ, to secure the payment of the debt sued upon, and evidenced by a valid judgment, superior to the rights of other creditors subsequently attaching the property. The Texas court expressly disapproved of the decision in *Johnson* v. *Gorham, supra,* and based their decision upon principle and authority.

These several cases cited, and the California case referred to, were presented to this court by the briefs of counsel in the case of *Montana National Bank* v. *Merchants' National Bank, supra.* The California doctrine was there disapproved of; for it was held that, as to a chattel capable of manual delivery in the possession of a garnishee, an inchoate lien or right is acquired by garnishment as to such chattel. I therefore find myself, in this dissenting opinion, in direct accord with the views of this court expressed in a late very important case, where the principal authorities relied upon by counsel in this case were considered by the court in arriving at the conclusions reached in that decision.

Attachments of goods and effects in the possession of third persons by service of writs are of old practice in our country. In Lousiana, in 1820, in *Scholefield* v. *Bradlee*, 8 Mart. (La.) 495, it was argued that no sufficient levy of an attachment was made upon goods, "inasmuch as there was no seizure or corporal possession taken by the sheriff." It was decided that an attachment in the hands of a garnishee was sufficient to place the property in the custody of the law, and that after service of such an attachment the sheriff had no right to go and take the property from the garnishee.

In *Erskine* v. *Staley*, 12 Leigh, 406, a service of an attachment process upon a garnishee by creditors of an absent debtor was held to be equivalent to an actual levy, and that, while the effects might remain in the hands of the garnishee, they were under the control of the court.

That the garnishee might be left in possession, where personal property capable of manual delivery was attached by constructive seizure, was also held in *Moore and Davis* v. *Byne and Hust*, 1 Richardson S. C. 94. (See, also, *Dennistoun & Co.* v. *N. Y. Croton & Steam Faucet Co.*, 6 La. Ann. 782; *Rennecker Glover* v. *N. J. Davis*, 10 Rich. Eq. (S. C.) 289; *Beaumont* v. *Eason*, 12 Heiskell, Tenn., 417; Rood on Garnishments, Sections 193, 194,—where the principles of the lien garnishment are discussed and applied within the limits of the principles which I believe should govern.

2. Inasmuch as I believe plaintiffs acquired liens by attachment, it is unnecessary for me to express an opinion upon the question whether or not the plaintiff's action is justified even without a showing of equitable lien by actual seizure. That important proposition of law not having been presented to the court on the argument, I prefer to reserve an opinion upon it.

3. I also dissent from the reasoning and argument of the majority opinion upon the evidence introduced. I agree that there is not sufficient evidence to show participation by H. L. Frank in any actual fraud in the sale to him by the assignee,

but I regard that matter as having nothing at all to do with the question of fraud in or upon the assignment itself. To recite the evidence upon which the jury found that the assignment in question was made with intent to hinder, delay and defraud creditors would take up too much space in a dissenting opinion. Suffice it to say that it was substantial, ample, voluminous. The lower court adopted the findings, made its conclusions, and thereafter denied the motion for a new trial. The jury and the judge of the district court saw the witnesses and heard them testify. This is of the greatest advantage, especially in cases of alleged fraud; and where, as here, the record fully sustains the action of the district court, I cannot concur in setting it aside. Believing that there were no prejudicial errors, I think the judgment should be affirmed.